SIDNEY I. WAILES *vs.* MARION DE KALB SMITH, Comptroller of the Treasury of the State of Maryland.

*Mandamus—Comptroller of the Treasury—Commissions to Agent—Claims against the United States.*

By Act of Congress, approved 5th of August, 1861, a direct tax of twenty millions, was levied upon real property, and this tax was apportioned among the several States according to representation. The State of Maryland assumed and paid its apportionment, less the cost of collection allowed by the Act, into the treasury of the United States. Subsequently the amount paid by the State was refunded by Act of Congress approved 2nd of March, 1891, the Act providing in express terms that no part of the money thereby appropriated should be applied by the State to the payment of commissions to any attorney or agent. The money thus refunded was accepted by the State upon the terms and conditions imposed by the Act of Congress, and a part was applied to the payment of the State debt, and the balance was invested for the benefit of the sinking fund. HELD :

That a *mandamus* would not lie to compel the Comptroller of the State to issue a warrant on the Treasurer for the payment of commissions on the amount refunded, to an agent who claimed to have rendered services in procuring the refunding, he having been appointed commissioner by the Act of 1878, ch. 224, with authority to prosecute the settlement of all claims of the State against the United States, as the act of issuing the warrant was not strictly a ministerial duty, the Comptroller being obliged to consider and determine whether the sum refunded constituted a claim within the meaning of the Act of 1878, ch. 224, and if so, whether it was recovered through the efforts of the agent entitling him to commissions.

The payment by the State of its quota of the direct tax did not constitute a claim against the United States within the meaning of the Act of 1878, ch. 224, inasmuch as the payment of such tax was but the discharge of a constitutional obligation, and imposed no duty upon the government of the United States to repay it to the State.

Waites *vs.* Smith, Comptroller.

*Mandamus* only lies where the ordinary and usual modes of proceeding and forms of remedy are powerless to afford redress, and where, without its aid, there would be a failure of justice; and even in such cases it only lies to enforce the performance of a strictly ministerial duty—a duty, the discharge of which requires the exercise neither of official discretion nor judgment.

APPEAL from the Circuit Court for Anne Arundel County.

This appeal was taken from an order of the Court below dismissing the petition for a *mandamus.* The case is stated in the opinion of this Court.

The cause was argued before ALVEY, C. J., ROBINSON, BRYAN, FOWLER, and McSHERRY, J.

*Charles Marshall,* and *Wm. Pinkney Whyte,* for the appellant.

In our construction of the Act of 1878, there can be no question as to the remedy for the refusal of the Comptroller to issue the warrant. The duty which he is required to perform is a purely ministerial one. He had only to ascertain the amount in the manner prescribed by the statute, as he did when the petitioner obtained the payment of other claims of the State. There was no exercise of discretion required; the duty was purely ministerial. *Thomas vs. Owings,* 4 *Md.,* 191; *Leonard vs. Wiseman,* 31 *Md.,* 208; *High on Extraordinary Remedies,* 81–8.

. All that is required to justify the Comptroller in drawing his warrant is that there shall be an appropriation by law which shall distinctly specify the sum appropriated and the object to which it shall be applied. *Constitution, Art.* 3, *sec.* 32; *Art.* 19, *sec.* 17, *of the Code.*

Appropriation of money to a specified object, the amount being definite and legally certain, would authorize the Comptroller to draw his warrant and the Trea-

Wailes *vs.* Smith, Comptroller.

surer to pay. So, direction to the officers to pay money out of the treasury upon a given claim, or for a given object, may by implication include an appropriation. *Ristone, Auditor vs. State,* 20 *Ind.,* 339, 360.

The Act making the appropriation need not name the specific amount. That may be left to be ascertained by some system of auditing or by some calculation. *Ristone, Auditor vs. State,* 20 *Ind.,* 361, 372.

The Act of 1878, ch. 224, contains all the elements of an appropriation of a definite sum of money, for a definite and expressed purpose. The money is not to be paid out of any particular fund, but out of any money in the treasury applicable to the payment of the debt mentioned in the contract.

The Comptroller had only to calculate the amount by reference to the Act itself, and the law would be read as if it directed him to draw his warrant on the Treasurer for the amount ascertained by the calculation.

Had the law said that the Comptroller should draw his warrant on the Treasurer for ten thousand dollars, in favor of the petitioner, for his commission on the claim collected by him from the government on account of the direct tax, there can be no doubt that it would have been a valid appropriation, and that the Treasurer would have been bound to pay it out of any money in the treasury. But this is what the law in effect does. The amount could not be named in the Act, but the mode of ascertaining it is so clearly defined as to be equivalent in law to a distinct statement of the amount.

In this connection, we submit that as the money is not payable to the petitioner out of the particular fund received from the government, and the Act of 1878 does not refer to that fund except to ascertain the amount that the State would owe the petitioner when the money should be paid into the treasury, it follows that even upon the construction of the Act of Congress directing

the repayment of the direct tax, relied upon by the defendant, there is no violation of the condition contained in that Act with reference to the payment of agents.

It will not be claimed, we suppose, that Congress intended to require the State not to use its own money in payment of its own obligations. See *Scaggs vs. Baltimore and Washington R. R. Co.*, 10 *Md.*, 268; 6 *B. & C.*, 475; *Maxwell vs. State*, 40 *Md.*, 273; *Clark vs. Mayor, &c. of Baltimore*, 29 *Md.*, 283; *Fisher vs. Blight*, 2 *Cranch*, 358, 399; *Smith vs. State*, 66 *Md.*, 215. Upon the authority of these cases, there was no warrant for the Court below to invent a new definition for the word "claims," which is as plain and unambiguous as any word in the language.

*John Prentiss Poe, Attorney-General,* for the appellee.

In passing upon the application of the appellant for the issuing to him of the warrant in question, the appellee, in his official capacity of Comptroller of the Treasury, was compelled to act judicially; to exercise judgment and discretion, to consider and decide several questions of law and fact, committed exclusively to him, and having considered and adjudicated these questions against the appellant, the courts have no power to review and reverse his decision. The duty which he was called on to perform was not purely ministerial, and as such subject to be guided and controlled by the Courts, but it necessarily involved deliberation, reflection, discretion and judgment, not subject to their supervision and control.

Before he could lawfully draw his warrant for the money demanded by the appellant, the Comptroller was obviously and necessarily required to examine and construe the Act of 1878, ch. 224, upon which the appellant based his claim, and to decide whether that law properly interpreted embraced such claim. He decided that it did not.

It was next incumbent upon him to examine into the facts of the case and to pass judgment upon the vital and fundamental facts, whether, assuming that the Act of 1878, ch. 224, did embrace such a supposed "claim" as that of the State against the government for the refunding of the direct tax, the appellant had procured, or been substantially instrumental in procuring, the passage of the Act of Congress of March 2, 1891; and further, whether under that Act he had recovered the amount of Maryland's payment of the direct tax. He decided that the appellant had not done either of these things.

He was next called on to examine and construe the Act of Congress of March 2, 1891, and the joint resolution of the General Assembly of January 26, 1892, accepting the terms and provisions of that Act, and to decide whether there was any provision in that Act or joint resolution which forbade payment to the appellant of the compensation claimed by him. He decided that there was such provision.

Finally it was his imperative duty, under the Constitution to consider and decide upon the legal effect of the Act of 1892, ch. 96, appropriating to the special purposes therein designated, the whole sum received from the United States, and to determine whether in the face of that Act he could lawfully draw a warrant in favor of the appellant upon the fund which it had directed him to disburse otherwise. He decided that he could not lawfully draw such warrant.

These questions, it must be conceded, were delicate and difficult. The decision of them manifestly required more than an arithmetical computation of what sum thirty per cent. of $371,299.83 would amount to, and the mere signing of a blank warrant for such sum. Indeed, the grounds of the contention that the discharge of the appellee's duty in such a case was a simple, obvi-

ous and single ministerial act are difficult to grasp; and unless the Court can see that his duty did not and does not involve anything beyond such a purely ministerial act, the *mandamus* cannot be ordered. *High on Extra. Rem.*, sec. 80; *Green vs. Purnell*, 12 *Md.*, 329; *Decatur vs. Paulding*, 14 *Peters*, 507, 509, 515; *Brashear vs. Mason*, 6 *How.*, 101; *United States vs. Seaman*, 17 *How.*, 230; *United States vs. Guthrie*, 17 *How.*, 292–3, 300, 303; *Commissioner vs. Whiteley*, 4 *Wall.*, 534; *United States vs. The Commissioner*, 5 *Wall.*, 565; *Ex parte De Groot*, 6 *Wall.*, 497; *Gaines vs. Thompson*, 7 *Wall.*, 352–3; *Secretary vs. McGarrahan*, 9 *Wall.*, 312; *State, &c. vs. Regester*, 59 *Md.*, 289; *Devin vs. Belt*, 70 *Md.*, 354–5.

The Act of Congress of March 2, 1891, contains the following proviso, viz., "And provided further, that no part of the money hereby appropriated, shall be paid out by the governor of any State *or any person*, to any attorney or agent under any contract for services now existing or heretofore made between the representative of any State or Territory and any attorney or agent."

By the joint resolution of January 26, 1892, the money was accepted by Maryland upon the terms and conditions of the Act of Congress, and accordingly when the appellee was called on to issue his warrant in favor of the appellant, he was asked to disregard what, in the exercise of his judgment as a public official, he held to be the condition upon which the money was received.

In his opinion, he was bound by that condition and had no power to ignore or repudiate it. Accordingly, for this and other reasons, he decided that he could not draw the warrant which the appellant demanded from him; and the Courts have no jurisdiction to review and reverse his official judgment and action, and compel him to issue a warrant which upon his sense of official duty and responsibility, he had decided he had no lawful right or power to issue.

Wailes *vs.* Smith, Comptroller.

ROBINSON, J., delivered the opinion of the Court.

This case has been very fully argued, and the interests involved are of more than ordinary importance. At the same time, however, it does not seem to us that any great difficulties present themselves in the consideration of the several questions upon which the petitioner's right to a *mandamus* depends. Now, what is this case? By an Act of Congress, approved 5th August. 1861, a direct tax of twenty millions of dollars was levied upon real property, and this tax was apportioned amongst the several States according to representation, as prescribed by the Federal Constitution—the apportionment of this State being $436,823.33. Provision was made for the assessment and collection of this tax against the individual owners of such property, but any State was allowed to assume and pay its quota of said tax; and under this provision the State of Maryland assumed and paid into the Treasury of the United States $371,299.83, being its apportionment, less fifteen per cent. allowed by the Act for the cost of collection. And thus the tax against the property of her citizens was thereby satisfied and extinguished.

Thirty years afterwards, by an Act of Congress, approved 2nd March, 1891, entitled "An Act to audit and pay to the several States and Territories and the District of Columbia, all moneys collected under the direct tax levied by the Act of 1861," the $371,299.83 thus paid was refunded to the State.

This is an application by the petitioner for a writ of *mandamus* to compel the Comptroller of the State to issue a warrant on the Treasurer for the payment to him of $111,389.94, being thirty per cent. commissions on $371,299.83 paid by the United States to Maryland, and to which he claims to be entitled under the Act of 1878, chapter 224. By this Act he was appointed commissioner with authority to prosecute the settlement of all

claims against the United States, and for his services he was allowed *thirty per cent. commissions on all sums recovered by him and paid by the United States into the Treasury of this State.* Among the claims which he was thus authorized to prosecute to a settlement, the petitioner contends, was a claim of the State for the repayment of its quota of the direct tax ; and that it was through his efforts and the efforts of agents of other States with whom he was associated, that the Act of 1891 was passed, whereby this tax was refunded to the State. And this being so, it was the duty of the Comptroller, as soon as the money was paid to the State, to have issued a warrant on the Treasurer for $111,389.94, being the commissions to which the petitioner was entitled, and for the payment of which appropriation had already been made by the Act of 1878. Briefly stated, the Comptroller, in his answer, in the first place, denies that the payment by the State of its quota of the direct tax constituted a claim against the United States within the meaning of the Act of 1878. And he denies also that the refunding Act of 1891 was passed through the efforts of the petitioner, or that he was in any manner instrumental in its passage. And he further denies, that at the time the demand was made upon him for the warrant in question there was any appropriation by law, as required by the Constitution, for the payment of the commissions claimed by the petitioner.

The case was heard by the Court below on bill, answers, and proof, and, as thus presented, the question is whether the petitioner is entitled to a writ of *mandamus* as prayed?

Now, it can hardly be necessary to say that a *mandamus* is a mandatory writ, and only lies where the ordinary and usual modes of proceeding and forms of remedy are powerless to afford redress, and where, without its aid, there would be a failure of justice. And even in

such cases it only lies to enforce the performance of a strictly *ministerial duty.* And by "ministerial" we mean where one is entrusted with the performance of an absolute and *imperative duty,* the discharge of which requires neither the exercise of official discretion nor judgment. As, for instance, where a specific sum of money is appropriated by law for the payment of certain defined services rendered the State, no one questions that in such a case the payment for such services by the proper officer may be enforced by *mandamus.* Where, however, the duty is one which necessarily requires the exercise of discretion and judgment, it is well settled that a *mandamus* will not lie to control or reverse the decision of one to whom the discharge of such duty is confided. It will not lie, because it is his discretion and judgment which are to be exercised, and not the discretion and judgment of the Court. But whilst this distinction will be found to run through all the cases, there is, it must be admitted, some conflict of opinion, in this country at least, as to what constitutes, strictly speaking, a *ministerial duty* as distinguished from a *discretionary duty,* within the meaning of the rule, and it may not be easy to reconcile the principles which are supposed to govern these decisions. Be that as it may, we take it to be settled by the best considered cases, that where the duty is such as necessarily requires the examination of evidence and the decision of questions of law and fact, such a duty is not ministerial, and not being ministerial, the decision of a public officer to whom the discharge of such duty has been confided cannot be reviewed or reversed in a *mandamus* proceeding. In the leading case of the *United States vs. Seaman,* 17 *Howard,* 230, where the relator, a printer to the United States Senate, applied for a *mandamus* to compel the Superintendent of Public Printing to deliver to him certain public documents, the printing of which he claimed to be entitled

to under an Act of Congress, Mr. Chief Justice TANEY said: "Now, it is evident that this case is not one which the Superintendent had nothing to do but to obey the order of a superior authority. He had inquiries to make before he could execute the authority he possessed. He must examine evidence; that is to say, he must ascertain in which House the order to print was first passed. And after he had made up his mind upon this fact, it was still necessary to examine into the usages and practice of Congress in marking a communication in their proceedings as a document; and to make up his mind whether separate communications upon the same subject or on different subjects from the same office, when made at different times, were, according to the usages of Congress, described as one document, or different documents, in printing and publishing their proceedings. He was obliged, therefore, to examine evidence and form his judgment before he acted ; and, whenever that is to be done, it is not a case for a *mandamus.*" And the rule thus laid down was approved and adopted by this Court in *Green vs. Purnell,* 12 *Md.,* 329, where it was held that the Comptroller, having the exclusive power under the Constitution, of adjusting and settling public accounts, was not a mere ministerial officer, and could not, therefore, be compelled by *mandamus* to perform any act in the discharge of his duties, which involved the exercise of discretion and judgment.

So the question comes to this, was the duty of the Comptroller in passing upon the petitioner's application for a warrant upon the Treasurer simply a mininsterial duty, or was it one requiring the exercise of judgment and discretion? And to this it seems to us there can be but one answer. The Act of 1878, did not designate or specify the claims which the petitioner was to prosecute to a settlement. His authority was general, and included all claims of the State against

the United States, but it can hardly be said that the payment by the State of a tax levied and collected as prescribed by the Federal Constitution constituted in itself a claim on the part of the State for reimbursement of the tax thus paid. And whether the tax was levied or paid under such circumstances as to impose a legal or equitable obligation on the United States to refund it, thereby, constituting a claim within the meaning of the Act of 1878, was a question which the Comptroller was obliged to consider and determine. And besides, assuming it to be a claim covered by the Act, he was further obliged to determine whether the money so paid to the State was recovered by the petitioner; for by the Act of 1878, he was to be allowed commissions upon such sums only as were recovered by him, and paid by the United States to the State. And especially was this his duty in face of the refunding Act of Congress, which provided in express terms, "that no part of the money, hereby appropriated shall be paid out by the Governor of any State or any person to any attorney or agent under any contract for services now existing or heretofore made between the representative of any State or Territory and any attorney, or agent." In view of such a provision, it could not be held that the mere payment to the State was in itself conclusive evidence that the money had been recovered through the agency of the petitioner.

And besides, the Constitution of this State provides that no money shall be drawn from the treasury of the State, except in accordance with an appropriation by law. Sec. 32, Art. 3. Now, by joint resolution passed 26th January, 1891, the General Assembly accepted the money thus refunded by the United States upon the terms and conditions imposed by the Act of Congress, that is to say, upon the condition that no part of the money thus repaid should be applied by the State to the pay-

ments of commissions to any attorney or agent.  And
by an Act, passed at the same session, the Legislature
directed that $202,645.71 of the tax refunded should be
applied to the payment of the State debt, and the entire
balance to be invested for the benefit of the sinking
fund.  And whether these Acts were to be construed as
repealing the appropriation alleged to have been made
by the Act of 1878 for the payment of commissions to
the petitioner, and as forbidding the payment of com-
missions to him, either out of the particular fund thus
refunded, or of any money in the treasury, were questions
which the defendant was necessarily obliged to consider
and determine.  And it is no answer to say, that these
Acts, so far as they attempted to deprive the petitioner
of commissions under his contract with the State, were
null and void because they are in conflict with the
Federal Constitution, which forbids a State passing any
law impairing the obligation of contracts.  Be that as
it may, it cannot be said that the duty of the Comptroller
in the premises was an absolute and imperative duty,
and therefore ministerial, requiring neither the exercise
of discretion nor judgment; that he had nothing to do but
to ascertain what would be thirty per cent. commissions
on $371,299,83, and to draw a warrant on the Treasurer
for the payment of such sum to the petitioner.  On the
contrary, he was obliged to decide delicate and import-
ant questions, both of law and fact, and, having decided
these questions, it is well settled that a *mandamus* will
not lie to reverse his decision, and to compel him to issue
a warrant for the payment of the rejected claim.

And here we might rest our decision, but in view of
the large interests involved in this case we prefer to rest
it on broader grounds, grounds which go to the merits
of the petitioner's claim for compensation, and upon
which the decision of the Court below was based, and
from which this appeal was taken.

Apart, then, from any objection to the mode of procedure itself, it must be conceded that, unless the payment by the State of its quota of the direct tax, constituted a claim against the United States within the meaning of the Act of 1878, there is no ground on which an application for a *mandamus* can be sustained. Now this Act is entitled "an Act to repeal chapter two hundred and sixty-two of the Public General Laws of the State of Maryland, of eighteen hundred and seventy-two, and re-enact the same with amendments." There is no question as to the construction and meaning of the Act of 1872. By it the petitioner and Mr. Daniel Clark were appointed commissioners with authority to adjust and settle certain *specified claims* of the State against the United States for expenses incurred in *enrolling*, arming, *subsisting*, and *transporting troops* employed in aiding the General Government in the prosecution of the war against the seceding States, and for the payment of which appropriation had been made by Act of Congress approved 27th July, 1861. Upon these claims upwards of one hundred thousand dollars was paid by the United States to the State, and commissions amounting to thirty thousand dollars were allowed and paid to the petitioner and his associate Mr. Clark. The argument, however, is that the Acts of 1872 and 1878, relating to the same subject matter, are to be construed together, and although the authority or agency of the petitioner is not limited by the Act of 1878, to any particular or specified claims, yet the nature and scope of his duties are the same under both Acts; in other words, that he was authorized by the Act of 1878, to prosecute the settlement of such claims only for the payment of which appropriation had already been made by Congress. This seems to us to be rather a narrow construction of an Act, the language of which is plain, explicit, and unambiguous, which, according to well settled rules, must be construed

according to its natural and legal import and meaning. And we agree with the petitioner, therefore, that the words "all claims" must be construed as including claims of every kind which the State had against the United States, whether appropriation had or had not been made by Congress for the payment of such claims. And we agree, too, that the language as was used in the statute may be said to include all claims or demands of the State arising under such circumstances as imposed a legal or equitable obligation on the part of the United States for the payment of the same. But, construing the language of the Act in this its widest sense, we do not see on what grounds it can be held to include a supposed claim of the State for the repayment of its quota of the direct tax. One may have a claim for taxes unlawfully levied or erroneously paid. But the direct tax was a constitutional tax levied and collected in the mode prescribed by the Constitution. The payment by the State of its apportionment of said tax was but the discharge of a constitutional obligation, and imposed no duty, therefore, on the part of the Government, legal or equitable, to repay it to the State. But, conceding this to be so, abstractedly considered, the argument is that, inasmuch as this tax was not and could not be enforced against the owners of property in the seceding States, this inequality in the burden of taxation in itself imposed a legal or an equitable obligation at least on the part of the United States to refund to such States and to owners of property the tax actually paid by them. Now, in answer to this it may be said that this tax was levied to furnish revenue to enable the Federal Government to prosecute the war against the Confederate States, and that Congress and the several States, and the owners of property by whom the tax was paid, all knew that, owing to the war then pending, it could not be enforced against the owners of property in the Confederate States,

except, at least, as against such property as might from time to time come within the lines of the Federal armies. And besides, the tax was levied and collected thirty years ago, and after the lapse of such a length of time it is impossible, in the very nature of things, to restore equality of contribution among the owners of property who paid the tax.   By the same Act of Congress an income tax was also levied, and the payment of this tax was never enforced against the citizens of the Confederate States, and yet it has never been supposed that this inequality in the burden of taxation imposed an obligation, legal or equitable, on the part of the United States to refund to the citizens of the twenty-seven States the tax paid by them.   The fact that one tax was levied on real property, and the other upon income, in no manner affects the supposed inequality in the burden of taxation.   And, although his views were somewhat criticised in the argument, it does seem to us that President CLEVELAND was right in saying, in his veto message, of the Refunding Act passed by the Fiftieth Congress, that it was nothing more or less than a *bald gratuity* on the part of the United States.   One thing is certain, neither before the passage of the Act of 1878, nor since has the Legislature of this State, or the Governor, or any other lawfully authorized authority, ever made a claim or demand of any kind on the Federal Government for the refunding of this tax.   If any such claim existed, a claim involving nearly four hundred thousand dollars, it is but fair to presume that an effort of some kind would have been made to enforce it.   So by no fair rule of construction can it be said that this supposed claim of the State is one which the petitioner was authorized under the Act of 1878, to prosecute to a settlement.   And here we may add that, even assuming it to be a claim included by the Act, there is no sufficient evidence in the record to show that the passage of the

Refunding Act of 1891, was in any manner due to his efforts or influence. On the contrary, the Act itself provides in express terms, that no part of the money thereby refunded, shall be applied to the payment of any attorney or agent, under any contract for service. And we can hardly suppose he was instrumental in the passage of an Act with a proviso, the manifest object of which was to prevent the payment to him of any compensation for services rendered under a contract with the State. There is no ground, then, it seems to us, on which the petitioner's claim to compensation can be supported. And such being our opinion, it is unnecessary to consider the motion made by the attorney-general to strike out of the record what purports to be evidence because there was no bill of exceptions taken to the rulings of the Court. In the trial of ordinary actions at law, if one proposes to avail himself of objections to the rulings of the Court he must do so by a bill of exceptions signed and sealed by the Court. A writ of *mandamus*, however, was at common law a prerogative writ issued out of the King's Bench, and tried before the King's Bench, and from its decision no appeal would lie. By our Code, either party is entitled to a jury trial and to an appeal. But if both parties waive a jury trial and the issues are tried before the Court, whether the judgment of the Court can be reviewed on appeal in the absence of a bill of exceptions to the rulings of the Court, is a question we need not now consider.

*Judgment affirmed.*

(Decided 12th January, 1893.)