(Decided April 4th, 1895.)

---

THE STATE OF MARYLAND, ex relatione, THE BALTIMORE, CANTON AND POINT BREEZE RAILWAY COMPANY *vs.* FERDINAND C. LA-TROBE, Mayor of the City of Baltimore, et al.

*Mandamus.—License to Dig up Streets.—Construction of Ordinance Authorizing Street Railway to be Built Within a Certain Time.— Forfeiture of Rights Under the Ordinance.*

The remedy by *mandamus* is not one which is accorded *ex debito justitiæ.* The writ is a prerogative one, and unless the right, which the relator seeks to enforce, is clear and unequivocal, a *mandamus* will not be granted.

An ordinance of Baltimore City provided that no person should, under any pretext, dig up any of the streets of the city without having first obtained a written permit therefor from the City Commissioner, approved by the Mayor. *Held,* that if a person or corporation is duly empowered by ordinance or legislative enactment to do an act involving such digging up of streets, as, for instance, to lay a street railway, neither the Mayor nor the City Commissioner can prevent the performance of that act by refusing to issue the permit, and in such cases its issue, not involving the exercise of a discretion, can be enforced by *mandamus.*

But if a person or corporation has not the right to do the thing which it is proposed to do under the permit applied for, the Mayor would be under no obligation to issue it, not because he has a discretionary power to grant or withhold it, but because, either with or without the permit, the proposed act would be illegal.

An ordinance of Baltimore City, passed in April, 1892, authorized a
certain railway company to lay tracks, &c., upon designated streets,
and directed that the company should commence the work of con-
structing the tracks within six months from date, and should com-
plete the road within twelve months thereafter, otherwise the rights
granted to be null and void.   A proviso declared that this limit of
time should not apply in case of delay caused by other parties, or in
case any of the designated streets may not have been graded and
paved at the time of the approval of the ordinance, or in case any
of such streets should be undergoing repairs so as to interfere with
laying the tracks, but that then the time for the *completion* of the
road shall be extended for a period of twelve months from the com-
pletion of such grading or repairs, or the removal of such delay.
An ordinance of the city, of November 25, 1892, provided that no
person or corporation should dig or tear up any of the streets of the
city without having first obtained a written permit approved by the
Mayor.   When the railway company's ordinance was passed, some
parts of some of the designated streets were not graded and paved,
and a bridge on one of the streets was not completed until October,
1893.   The railway company caused thirty feet of track to be laid on
one street on October 7, 1892, and nothing more was done towards
constructing the road until June 7, 1894, when application was made
to the Mayor and City Commissioner for a permit to dig up the
streets, for the purpose of laying the tracks of the company.   Upon
their refusal of the application, a petition was filed praying for a
*mandamus* directing the issue of such permit by the Mayor and Com-
missioner.   *Held*,

1st.  That under the ordinance the company was bound to begin the
   work of laying the tracks within six months from its enactment, and
   that the extension of time in the proviso to twelve months after the
   completion of the grading of the streets related, not to the begin-
   ning of the work by the company, but to its completion after its
   progress had been interrupted.

2nd.  That because some of the designated streets were not graded and
   paved at the time of the passage of the ordinance, the company was
   not relieved from the necessity of beginning the work within six
   months thereafter, but the time limit was only suspended in case the
   specified obstacles arrested the actual construction.

3rd.  That the laying down of only thirty feet of track in October,
   1892, was not such a beginning of the work as was contemplated by
   the ordinance.

4th.  That since the company had failed to comply with the condi-
   ditions of the ordinance its rights under the same were lost and
   it was not entitled to the *mandamus* asked for.

5th. That after the lapse of the time limit, the enactment of the ordinance requiring permits to dig up the streets was in effect a denial of the company's authority to exercise the rights granted to it, upon conditions which had not been complied with.

6th. That under these circumstances the failure of the company to begin and complete the road within the time specified by the ordinance could be availed of by the Mayor as a defence to the application for a writ of *mandamus.*

Appeal from an order of the Court of Common Pleas (PHELPS, J.), dismissing a petition for a writ of *mandamus.*

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, PAGE, ROBERTS and BOYD, JJ.

*Bernard Carter,* for the appellant.

The appellant contends that the true interpretation of the 12th section of the ordinance is as follows: 1. That while by the *first* part of the section the company is required to *commence* the work of laying down and constructing its railway tracks within six months from the approval of the ordinance, yet by the *proviso,* it is *entirely relieved* of this obligation, and no time is prescribed for the commencement of said work in *either* one of the *three* following contingencies, that is to say: (1) in case of delay caused by other parties, or (2) in case *any* of the streets named for the route of the railway, may not have been *graded* and *paved* at the time of the *approval* of the ordinance, or (3) should *any* of said streets be undergoing repairs in such manner as would interfere with the laying and constructing of the said railway tracks.    2. While by the *first* part of the section, the company is required to *complete* its road and begin the running of its cars within twelve months from the *approval* of the ordinance, yet by the *proviso,* it is declared that in *any* one of *three* contingencies the twelve months time for the completion of the road shall *not* be computed from the *approval* of the ordinance, but from *other* points of time; the three contingencies thus named, are either in *case* of delay caused by other parties, or *in case any* of the streets named in the

ordinance as forming the route of the railway may not have been *graded* and *paved* at the *time* of the *approval* of said ordinance, or should any of said streets be undergoing repairs by the city authorities in such manner as would interfere with the laying and constructing of said railway tracks; and it is declared by said proviso, that if any one or more of said three things shall be, then the time of the completion of said road, instead of being twelve months from the *approval* of the ordinance, shall be extended to a period of twelve months from the *removal* of the delay caused by other parties, if the action of other parties shall have caused delay; or if *any* of the streets were not graded and paved or were being repaired at the time of the approval of the ordinance, then the time should be extended for twelve months from the completion of the grading of all of the streets, or the completion of the repairs.

So far as the completion of its road is concerned, the twelve months period for said completion is not to be computed from the approval of said ordinance, as stipulated in the first part of said section 12, but, according to the terms of the proviso to said section, that is to say, from the time when the grading and paving of both of said streets shall have been completed; and that therefore, as the grading and paving of a portion of Lexington street was not completed until October 23d, 1893, the time for the completion of its railway by the appellant (even if said Lexington street was the only street forming part of the route of the road not graded and paved at the time of the approval of the ordinance) would not expire till October 23, 1894, and the appellant was entitled to the permit it asked for to enable it to construct its road when it asked for it on June 7, 1894. And as Canton avenue, between Cannon and Luzerne streets (forming part of said route), was not graded and paved at the time of the trial of this case below (and so far as there is any evidence before the Court, is not yet graded and paved), the twelve months mentioned in the proviso will not (at the least) have expired until June, 1895.

There was no necessity for the Mayor and City Council of Baltimore to put in the ordinance any limitation of time for the beginning and completion of the work ; and, therefore, it could make any thing it saw fit, a reason for wiping out the limitation. No harm could come to anyone by a total *absence of any limitation* as to the time for the building of the road, as it was always in the power of the Mayor and City Council of Baltimore to repeal the ordinance ; and if repealed before work was begun on the road, to repeal it without making any compensation of any kind. *Lake Roland R. R. Co.* v. *M. & C. C. of Baltimore*, 77 Md. 352. As the city has in many instances placed no limitation of time for the building of the passenger railways, the construction of which it authorized, there is no reason why, when it did insert these limitations, it should not have made them inapplicable in any state of case it *chose to name*, and in any state of case in which it thought there might be a possible reason for the exemption from such limitation.

But independently of the foregoing, and even supposing *ex gratia argumenti*, that the appellant did not comply with the requirements of the 12th section as to the commencement and completion of its railway, yet, as the Mayor and City Council of Baltimore had taken no action to enforce the forfeiture of the rights granted by said ordinances, it is respectfully submitted that those rights were in full existence at the time the application was made by the appellant to the City Commissioner for the permit to proceed with the construction of its road, and therefore neither the City Commissioner nor Mayor had any right to *refuse said permit* because it was not within the power of either of said officials to *enforce the forfeiture* of those rights, as a consequence of the failure by the appellant to comply with the requirements of said section 12. *Hodges* v. *Balto.,&c., Co.*, 58 Md. 623 ; *Hiss* v. *Hampden Ry. Co.*, 52 Md. 255 ; *Schulenberg* v. *Harriman*, 21 Wall. 44 ; *Farnsworth* v. *M. & P. R. R. Co.*, 92 U. S. 66 ; *McMechin* v. *U. S.*, 97 U. S. 218 ; *St. Louis* v. *McGee*, 115 U. S. 473 ; *Railroad Co.* v. *City*, 44 La. An. 751.

Now, suppose the Mayor and City Council of Baltimore had never passed the *permit* ordinance, and matters remained as they were before said ordinance was passed, that is to say, no permit was issued to persons or corporations authorizing them to put down structures on the streets; and suppose the appellant had proceeded in June last to go on with its work, and the Mayor had applied to the Equity Court for an injunction to prevent it, on the ground that it had not complied with section 12, and, therefore, had forfeited its rights? Could such a bill have been maintained? If it could be, then the *Mayor* can *enforce* a forfeiture, when the other branch of the city government (the legislative branch), has taken no action for this purpose. Now, if *affirmative* action on the part of the city is required to enforce a forfeiture, which is the result of the *Hodges case*, then certainly the Mayor, who at the best is only one-half of the city government, cannot enforce it. Now, if the bill for injunction by the Mayor alone would not have lain for the reasons stated, then it follows that in June last the right of the appellant under the Ordinance No. 50, of April, 1892, were in full force, and it has the legal right to proceed with its work.

If the appellant was entitled to proceed with the construction of its road under Ordinance No. 50, of 1892, authorizing it to build its road, the City Commissioner was obliged to issue a permit to it to tear up the streets for the purpose of building it, and neither the City Commissioner or the Mayor had any right to refuse to issue the permit, and had *no discretion whatever* in the premises.

*Thomas G. Hayes, City Counsellor*, and *Arthur W. Machen* (with whom was *William S. Bryan, Jr., City Solicitor*, on the brief), for the appellees.

*Mandamus* does not lie. By the Act of Assembly, 1890, chapter 370, its was enacted that the Mayor and City Council of Baltimore should have power to regulate the use of the streets, lanes and alleys in the city of Baltimore,

by railway or other tracks, &c.    Under this Act the ordinance of 1892-93, No. 2, approved November 25th, 1892, was passed, which wholly prohibits all persons, natural or corporate, from digging up or disturbing the surface of any of the streets of the city, without having first obtained a permit therefor from the City Commissioner, *approved* by the Mayor.

Will *mandamus* lie to compel the Mayor in such a case to give his approval?    Both reason and authority forbid. If the judgment of a judicial tribunal is substituted for the Mayor's judgment upon the matter, it is not *his* approval which is given, but the approval of a Court.    But the Mayor and City Council, having power altogether to refuse permission to disturb the surface of the streets or absolutely repeal Ordinance No. 50, by the ordinance of November, 1892, delegate to the Mayor the office of passing upon each case and deciding whether or not the applicant is entitled to the permit he asks for.    The Mayor signs every *ordinance* which he approves, but his judgment in this cannot be controlled by an external power; no more can it be controlled when he is asked to approve a permit of the kind in question.    His approval is an act of his own mind, and he must necessarily exercise his own judgment in the matter.

To read the proviso at the end of the 12th section in the manner claimed by the appellant's counsel, involves practically a repeal of the preceding express enactment.    That never could have been the legislative intention, and to give the proviso such effect is to convert it into a device to cover up a latent meaning in a cloud of ambiguous words, apparently consistent with the previous enactment, but concealing a purpose to nullify it.    Such a meaning, if allowed, would be as derogatory to the promoters of the scheme as deceptive and injurious to the public.

The entire omission in the proviso to provide for postponement of the *commencement* of work under the ordinance, is very significant.    On the whole, two conclusions, we

think, follow necessarily from the reading of the ordinance in the light of the true rule of construction: First, that there is no provision for any postponement of *commencing* work; second, that it was intended that the work, after expiration of the six months from the time of the approval of the ordinance, should be diligently prosecuted whenever practicable, and that delay in completion was only excusable as to such portions of the railway as the specified causes directly operated upon. The object of the 12th section must be regarded. And any interpretation of it which would relieve the petitioners from beginning the substantial construction of any of the proposed railways for a period of over two years from the date of approval of the ordinance, would defeat the purpose of the Mayor and City Council, which certainly must have been that the grantees should actually and in good faith begin the work of constructing the railway within six months, and then prosecute it with despatch so as to complete all parts of it within two years, except in so far as prevented by obstacles beyond their control, and in the event of the existence of such obstacles, then, in so far as they might operate, within twelve months after the removal of them. *People* v. *Broadway, &c., Co.,* 126 N. Y. 29.

The appellant's contention that the right granted by the ordinance is in the nature of a corporate franchise, not open to attack except in a direct proceeding, is insubstantial. The Mayor and City Council, by the ordinance of 1892, No. 50, authorized the occupation of the street for railway purposes, subject to certain limitations and conditions. One was that the work should be commenced within a prescribed period of time. Unless that is fulfilled, there is no grant. The condition inheres in the grant, and is a part of it. The grantees accept the privilege as it is given, and not otherwise. It is true the municipality which makes the qualification can dispense with it, and therefore *third persons* have no right to interfere with the exercise of the granted privilege in the absence of an insistance upon it by the city. This

reasonable proposition was affirmed in *Hodges* v. *The Balti-more Union Passenger Railway Company*, 58 Md. 323. But the *city* may insist upon it.    It does so when, as in this case, the Mayor, its executive, acting by virtue of a city ordi-nance, refuses to permit the grantees of the privilege to make use of it after the expiration of the time within which only, under the terms of the grant, it was authorized to put it in use.    Relator's counsel, putting a very strained and unauthorized construction upon a passage in the opinion of this Court in *Hodges* v. *The Baltimore Union Railway Com-pany*, contended below, and we have to presume will con-tend here, that to enable the Mayor and City Council of Baltimore to take advantage of the condition it has pre-scribed, resort must be had to a proceeding, in the nature of a *quo warranto*, to *forfeit* the so-called franchise.    But, for the granting power to insist upon the condition it has imposed, is not, properly speaking, an *act of forfeiture ;* the right has lapsed or expired by force of its own limitation, and 'the city authorities, acting within the scope of powers entrusted to them, may enforce the ordinance and refuse to allow a violation of it.

The rights conferred on the appellant by Ordinance No. 50, were but a license revocable at the pleasure of the city before it was executed, and revocable after it was executed, upon the payment of a fair indemnity.    *Lake R. E. Ry. Co.* v. *M. & C. C. B.*, 77 Md. 386.    If, then, the city could at any time wipe out the whole of Ordinance No. 50, by its total repeal, it certainly could attach to the exercise of the license the additional condition of requiring the appellant to obtain a permit approved by the Mayor before tearing up the streets of the city.    It may and does, by an express power delegated to the Mayor by Ordinance No. 2, put it in the power of the Chief Executive of the City of Balti-more to decide, in the exercise of his discretion and judg-ment, whether the public interests justify the tearing up the streets for railway tracks at the time the permit is sought. This unquestionably does suspend the license.    The city

had a perfect right to do this.   Ordinance No. 2 was the exercise by the Mayor and City Council of Baltimore of a power conferred both by Act 1890, ch. 370, and existing under its general powers.   This being so, whether or not it is wise or judicious to confer such power upon the Mayor, is not a judicial question.   The appellant has it in its power to apply to the legislative department of the city, and if that department considers it proper, it may, by a proper ordinance, except the appellant from the operation and effect of Ordinance No. 2.   This is the only course open to the appellant when the Mayor, in the exercise of his discretion, has, for public reasons and for the interest of the public, refused to approve a permit to tear up the streets of the city. The act of the Mayor, under the powers of the municipality delegated to him by Ordinance No. 2, was the act of the corporation.

McSHERRY, J., delivered the opinion of the Court.

The Baltimore, Canton and Point Breeze Railway Company is a body corporate, and by ordinance number 50 of the Mayor and City Council of Baltimore, approved April the eighteenth, eighteen hundred and ninety-two, it was authorized to lay its tracks upon and along certain designated streets of Baltimore City.   By the 12th section of the ordinance, the work was required to be commenced within six months from the approval of the ordinance, and to be completed within twelve months thereafter, "otherwise," so the section declares, "the rights and privileges herein granted shall be null and void."   A qualifying proviso then follows. Its terms and provisions, which vitally affect the pending controversy, will be fully stated later on.   By ordinance number two, approved November the twenty-fifth, eighteen hundred and ninety-two, it was declared unlawful for any person, under *any pretext* or for *any cause whatever*, to dig up any portion of the streets, lanes or alleys of the city "without first having obtained a written permit therefor from the City Commissioner approved by the Mayor."   On the

seventh day of October, eighteen hundred and ninety-two, without the knowledge of the City Commissioner, and not under his supervision, the railway company caused *thirty feet* of track to be laid on North Bond street, south of North avenue, and although many of the streets over which the proposed railway was projected to be laid were graded and paved and in a condition to have tracks constructed upon them, no further steps were taken to build the line until June the seventh, eighteen hundred and ninety-four, when application was made to the City Commissioner for a permit, and to the Mayor for an approval of a permit, to dig up the streets for the purpose of laying the tracks. The Mayor and City Commissioner refused to issue the permit, and they based that refusal on the ground that ordinance number fifty, of eighteen hundred and ninety-two, had not been complied with in such manner as would authorize the construction of the work. Upon June the eleventh, eighteen hundred and ninety-four, The State of Maryland, on the relation of the Baltimore, Canton and Point Breeze Railway Company, filed a petition in the Court of Common Pleas against the Mayor and the City Commissioner praying that a writ of *mandamus* be granted requiring the City Commissioner to issue and the Mayor to approve a permit authorizing the relator to dig up the streets mentioned in ordinance number fifty, for the purpose of laying upon those streets the tracks of the relator's railway. The respondents duly answered, and on July the twenty-eighth an order was signed denying the relief sought and dismissing the petition altogether. From that order this appeal was taken.

There are two questions arising out of these facts. The one is whether the Mayor had a discretion to grant or refuse the permit ; and, upon the assumption that he had not, the other question is whether, when the application was made for the permit, the relator had such a clear right and authority under ordinance number fifty to lay its tracks as entitled it to relief by *mandamus*.

With respect to the first question, but little need be said.

The law is definitively settled both here and elsewhere that whenever the performance of a duty is dependent upon the exercise of judgment and discretion on the part of the person to whom the performance of that duty is assigned, that judgment and that discretion will never be interfered with, fettered or controlled by the writ of *mandamus*. The reason for this is apparent, and it is that there is no warrant of law justifying the substitution of the judgment of the Court in the place of the discretion and judgment of the individual exclusively entrusted with the performance of the particular duty. ·But when the duty imposed is strictly a ministerial one, is absolute and imperative, and in its discharge requires the exercise of neither official discretion nor judgment, then a *mandamus* will lie to enforce its performance. *Wailes* v. *Smith*, 76 Md. 477 ; *Madison* v. *Harbor Board*, 76 Md. 398 ; *Devine* v. *Belt*, 70 Md. 352. To which class of duties, then, discretionary or strictly ministerial, does the one relating to the granting and approving the permit applied for by the relator belong ? Where a clear right exists to do an act, as for instance, to lay a street railway on a public thoroughfare of the city, the Mayor and City Commissioner have no authority to refuse a permit allowing the streets to be torn up in furtherance of that object. If the act to be done be a lawful one and be sanctioned by legislative enactment or by a city ordinance, and if the person or body corporate proposing to do it be duly empowered to perform it, the Mayor and City Commissioner cannot, nor can either of them, make the act illegal or prevent its performance by refusing to issue a permit, which, if granted in the case supposed, would add nothing to the pre-existing power, and whose sole effect would be to indicate to the police authorities that the interference with the streets was no invasion of the laws of the municipality. To concede to the Mayor a discretion to grant or withhold a permit in such a case would clothe him with authority to nullify at his pleasure a formal grant made by the City Council. There may possibly be instances .where, under ordinance number two, the Mayor

would have a discretion ; but when permission has, by ordinance, been distinctly granted to a person to do an act which necessarily requires and in terms is declared to involve in its proper performance the digging up of the city streets as a part of the very thing to be done, the Mayor obviously has no right by a simple refusal of a permit to defeat the doing of the act authorized to be done, and thus practically to abrogate and repeal the formal permission granted to do it.   Clearly, then, if when the permit was applied for in the case at bar, the relator possessed an undoubted power under ordinance number fifty to occupy with its tracks ·certain streets of Baltimore City, it was the duty of the Mayor to approve that permit, and this duty involving the exercise of no discretion whatever was, if it existed at all, plainly and imperatively ministerial.   But, if there were then no authority under the laws of the State or under the ordinances of the city to do the act, for the doing of which the permit was sought, the Mayor cannot be required to issue the permit, because even if issued it would not, under such conditions, of its own vigor make that legal which would otherwise be illegal.   It follows, then, that if a person or a body corporate has no lawful right to do the thing which it is proposed to do under the license applied for, the Mayor would be under no obligation to issue the permit, not because he has a discretionary power to grant or withhold it at his option or according to his judgment, but solely because either with or without the permit, the act proposed to be done would be illegal.   If there were no duty on his part to issue the permit, his refusal to grant it would furnish no ground for requiring him by *mandamus* to do that which under the law he had no authority to do at all.   As a consequence, the question is as to the *power* of the Mayor to issue the permit ; and that question is one for judicial determination.   And this brings to us the second and vital inquiry arising on the record.   The solution of that inquiry depends upon the meaning of the twelfth section of ordinance number fifty, and it will therefore be necessary to

quote that section in full, so that its exact provisions may be seen.   It is in these words:

"That the said proprietors, their associates or assigns, shall commence the work of laying down and constructing the railway tracks aforesaid, within six months from the approval of this ordinance, and shall complete the said work and commence the regular running of cars within twelve months thereafter, otherwise the rights and privileges herein granted shall be null and void; provided that the provisions of this section shall not apply in case of delay caused by other parties, or in case of any of the streets hereinbefore named may not have been graded and paved at the time of the approval of this ordinance, or should any of said streets be undergoing repairs by the city authorities in such manner as would interfere with the laying and constructing of the railway tracks aforesaid, then the time for the completion of said railways shall be extended for a period of twelve months from the removal of such delay, or the completion of such grading and paving or repairs."

It is needless to allude to the familiar rules and canons of construction frequently invoked in the interpretation of legislative enactments, because the language employed in the section just transcribed is so free from obscurity or uncertainty that little or no difficulty in ascertaining its meaning and purpose is or can be presented.   There was, obviously, a reason for inserting the provision fixing a time for beginning and for completing the construction of the road.   As the railway was, when finished, to occupy a number of streets, all of which would have to be interfered with to some extent during the progress of the work on the road, it was clearly for the protection of the public interests and for the convenience of persons who might use these thoroughfares, that the requirement exacting proper diligence in beginning and in prosecuting the work to completion was incorporated in the ordinance.   It was not an idle or meaningless clause, and its terms are neither ambiguous nor equivocal.   That it was intended to be operative

and effective, the City Council left no room for speculation, because for a failure to comply with it, they, in the same sentence, by plain language, whose meaning is unmistakable, imposed the drastic penalty of a revocation of all the rights and privileges granted by the preceding sections of the ordinance. As, however, it was apparent at the time the ordinance was passed that conditions then existed and that others might arise later on, which, while not retarding the prompt beginning of the work, might possibly prevent its ultimate completion within the allotted period of twelve months, the saving proviso was inserted. With a view, then, of suspending for a definite time the prescribed penalty, and to arrest its operation upon a failure to complete the road within the limit of time designated, the proviso was added. It contains three contingencies, each one of which has specific reference to an interruption in the actual progress of the work, whereby its completion would be unavoidably delayed through no fault or *laches* of the relator. There is not a suggestion in the whole ordinance that the relator's voluntary delay in beginning and in prosecuting the work, though not actually impeded or stopped in any one of the three ways specified in the proviso, should be treated or considered as a waiver or suspension of the penalty. The policy and purpose of the twelfth section, as well as its natural reading, imperatively forbid the adoption of a different construction. If delays were caused by other parties, not the relator; or, if the streets over which the road was to be laid were not graded and paved when the ordinance was appoved; or, if any of the streets were undergoing repairs so as to interfere with the laying of the tracks, *then*, and it is put as a consequence of *these* interruptions, "the time for the *completion* of said railways"—not for the *beginning* of the work thereon—"shall be extended for a period of twelve months from the removal of such delay or the completion of such grading and paving or repairs." It is obvious, then, that the extension of time relates not to the beginning of the work, but to the *completion* thereof, after

its substantial progress had been arrested in one or more of
the three ways indicated.    As we have already explained,
on October the seventh, eighteen hundred and ninety-two,
or just ten days before the expiration of six months from
the approval of the ordinance, the relator laid down *thirty
feet* of track on Bond street and then voluntarily stopped.
This was manifestly not such a beginning of the work as the
ordinance contemplated.    The relator was not prevented by
delays caused by third persons, or caused in either of the
other modes named in the proviso, from proceeding with
the work ; nor did it go on with the work thus commenced,
as according to the plain meaning of the ordinance, it was
bound to do until it reached an ungraded and unpaved
street or encountered a street undergoing repairs.    The
company, however, assumed that the proviso did not relate
solely to the time of *completing* the work, but that its effect
was actually to strike down and completely nullify the ex-
press limit of six months within which to begin the work ;
and, as a consequence, it insists that it was under no obli-
gation to do anything towards building the road, if, when
the ordinance was approved, any of the obstacles in the way
of the final completion of the whole work existed at any
point upon the entire route.    To this we cannot agree,
because when the proviso declares that the "provisions of
this section shall not apply" in the three designated instances,
its manifest meaning is that the preceding limit as to time
is not to apply in the event that the specified obstacles
should present physical obstructions to the continuous
prosecution and completion of the work ; and that the time
limit should then be suspended, but only in so far as these
physical impediments interrupted the progress of actual
construction.    In support of this view the case of the *People*
v. *Broadway R. R. Co.*, 126 N. Y. 29, is directly in point.
It follows, then, that according to the terms of the twelfth
section the relator, when it made application for the permit
in June, eighteen hundred and ninety-four, had no right or
authority to lay its tracks, under ordinance number fifty.

Whether that want of authority or lack of power can be availed of in this proceeding will be discussed later on.

Now, the remedy by *mandamus* is not one which is accorded *ex debito justitiæ*.    The writ is a prerogative one, and unless the right which the relator seeks to enforce is clear and unequivocal, it will not be granted.    *Brown* v. *Bragunier*, 79 Md. (29 Alt. Rep. 7) ; *Weber* v. *Zimmerman*, 23 Md. 45 ; *Hardcastle* v. *R. R. Co.*, 32 Md. 32 ; *Legg* v. *Mayor, &c.*, 42 Md. 203.    If the construction which we have placed upon the twelfth section of ordinance number fifty be the correct one, as we believe it to be, then it is perfectly manifest, as already observed, that the relator on June the seventh, eighteen hundred and ninety-four, had no such clear and unequivocal right to dig up the streets as it lays claim to in its petition.    And if this be so, then obviously there was no such plain co-relative duty devolved upon the Mayor by ordinance number two, of November, eighteen hundred and ninety-two, as to make it unconditionally obligatory on him to grant the permit applied for.    There being then neither the clear and unequivocal right, on the one hand, to do the act proposed to be done, nor, on the other hand, the plain ministerial duty to issue the permit allowing it to be done, there is no case presented for redress by the writ of *mandamus*.

But it was objected that under the decisions in the *Canal case*, 4 G. & J. 1 ; *Hodges' case*, 58 Md. 603, and *Bonaparte's case*, 75 Md. 349, the failure of the company to begin and complete the construction of its road within the times limited in the ordinance could not be availed of collaterally by the Mayor of the city as a defence in this proceeding.    In *Hodges' case*, the railway company did not begin to construct its road within the time prescribed by the ordinance which authorized the tracks to be laid; and when the company did thereafter proceed to construct its road, several persons who owned property which abutted upon Park avenue, one of the streets proposed to be occupied, filed a bill in equity for an injunction to restrain the building of the road.    They claimed amongst other things that

the company, by its failure to begin the work within the
time limited, had forfeited its rights under the ordinance to
build the road at all.    Upon the question as thus presented,
it was held that the provision fixing a limit was intended
for the benefit of the city, and was one which its authorities
might waive at pleasure, and was, consequently, one which
could not be invoked by a private individual. "No principle,"
say this Court, "is better settled than that a cause of forfeiture
cannot be taken advantage of or enforced against a corpora-
tion collaterally or incidentally, or in any other mode than by
a direct proceeding for that purpose against the corporation."
But it cannot be pretended that we are confronted with the
same conditions now.    This defence by the Mayor is not an
attempt by a private person to enforce in a collateral proceed-
ing a cause of forfeiture.    The executive of the very
municipality which originally granted the privilege to lay
the tracks, in acting under a valid subsequent ordinance,
whose due execution he was charged with faithfully enforc-
ing, refused to grant a permit prescribed by ordinance
number two, of November, eighteen hundred and ninety-
two.    The reasons assigned by him are immaterial, if he
had no power to approve the permit.    Now, ordinance
number two, approved a month *after* the expiration of the
limit of six months fixed by ordinance number fifty for the
commencement of the work, is a declaration by the Mayor
and City Council that the municipality did not waive the
time limit in ordinance number fifty, nor the consequences
following the non-observance thereof; for it expressly pro-
hibited, from and after its passage, the digging up of the
streets under a*ny pretext* or for *any cause*, without a per-
mit being first procured—a broad restriction that did not
exist during the whole period allowed for beginning the
work under ordinance number fifty, and one utterly incon-
sistent with the hypothesis that the city authorities recog-
nized the company's unqualified right to lay the tracks
thereafter.    Its effect was, *not* to waive the enforcement of
the time limit, but to provide a direct and speedy mode for

putting into force the provision containing that limit. It substantially ordained that the city not only refused to waive the time limit, but that it designed to enforce it, and therefore the ordinance exacted a permit as a means to prevent that from being done which previously could have been lawfully done, but which, by reason of the lapse of the time within which it ought to have been done, could not afterwards lawfully be performed. If the city, by a direct repeal of ordinance number fifty, could have taken away the rights conferred by that ordinance, and of this there can be no question, then it could equally accomplish the same result by a general enactment that involved in its operation and effect a denial of authority to exercise those rights which, as between the city that granted them and the company that had accepted them, coupled with the conditions, were lost and had lapsed by a failure on the part of the company to comply with those very conditions. Of course, legislation of this sort to be effective as a repeal or a revocation of previously granted rights and privileges, for a breach of a condition subsequent annexed to the grant, must show an intention to reassert title and to resume possession. And as we understand it, such was, at least, one of the objects and purposes of ordinance number two, of November, 1892. After the lapse of the time limit and the enactment of ordinance number two, the Mayor had no right to grant the license; and the city, by adopting the last named ordinance after the expiration of the time limited for beginning the work, having asserted an enforcement of the consequences following from a breach of that condition, the case, as thus presented, materially differs from those cited above, and whilst they announce a perfectly correct and well-established principle, this case, for the reasons we have stated, does not fall within its range or application.

We need only add that nothing we have said is to be understood as affecting in any way the franchise conferred upon the relator by its charter to operate a street railway in Baltimore City; though the franchise can only be exercised

in such mode as the city, which has absolute control over its own streets, may by reasonable regulations prescribe.

For the reasons we have assigned, the order appealed from will be affirmed with costs.

*Order affirmed with costs.*

(Decided April 4th, 1895.)


BRYAN, J., delivered the following separate and in part concurring opinion :

This was a petition for a *mandamus* addressed to the Court of Common Pleas.   The relator in the petition is the Baltimore, Canton and Point Breeze Railway Company of Baltimore City, a corporation duly constituted and organized.   The Mayor and City Council of Baltimore, by ordinance approved April 18th, 1892, granted permission to the relator to lay down and construct double iron railway tracks in certain streets of the city of Baltimore.   These streets are designated in the first section of the ordinance.   The tracks were permitted to commence on North Calvert between Fayette and Lexington, and to run eastwardly on Lexington, and over a number of other streets to the eastern limit of the city on O'Donnell street.   The time for commencing and completing these tracks was limited in the twelfth section of the ordinance.   As the construction of this section was earnestly debated at the bar, we think it proper to insert it in full ; premising that the relator is duly invested with all the rights granted to the persons therein described as "the said proprietors, their associates and assigns."

"And be it further enacted and ordained, that the said proprietors, their asssociates and assigns, shall commence the work of laying down and constructing the railway tracks aforesaid, within six months from the approval of this ordinance, and shall complete the said work and commence the regular running of cars within twelve, months thereafter, otherwise the rights and privileges herein granted shall be

null and void; provided, that the provisions of this section shall not apply in case of delay caused by other parties, or in case any of the streets hereinbefore named may not have been graded and paved at the time of the approval of this ordinance, or should any of said streets be undergoing repairs by the city authorities in such manner as would interfere with the laying and constructing of the railway tracks aforesaid, then the time for the completion of said railways shall be extended for a period of twelve months from the removal of such delay or the completion of such grading and paving or repairs."

The petition for a *mandamus* alleged at the time of the approval of the ordinance a portion of Lexington street, on which the railway tracks were authorized, was not graded and paved, and that this grading and paving was not completed until the twenty-first day of October, eighteen hundred and ninety-three; that a bridge over Jones' Falls, which the tracks were authorized to cross, was not completed prior to September twenty-third, eighteen hundred ane ninety-three; and that a portion of Canton avenue, forming a part of its route, is not yet graded and paved. The petitioner further alleged, that it did commence laying its tracks within six months after the approval of the ordinance.

It further alleged, that on the seventh day of June, eighteen hundred and ninety-four, it made application in writing to the City Commissioner for permission to tear up the streets for the purpose of laying its tracks; and that the Commissioner and the Mayor refused to grant the permission, and made under their signatures the following endorsement on the application: "Permit refused, on the ground that the provisions of Ordinance No. 50, approved April 19th, 1892, were not complied with in such manner as would authorize the construction of the road under said ordinance." The prayer of the petition was for a *mandamus* requiring the Commissioner and the Mayor to approve the permission. By an ordinance of the Mayor and

City Council ' of Baltimore (approved November 25th, 1892), it was enacted that no person or corporation should, under any pretext, or for any cause whatever, dig up any of the streets, lanes or alleys of the city, or remove therefrom any of the stones, bricks, blocks, cement or other material with which the same may be paved, in whole or in part, without having first obtained a written permit therefor from the City Commissioner, approved by ·the Mayor. The answer of the respondents maintained that the relator had forfeited whatever right it had to lay down the tracks, by its failure to perform the conditions on· which the right was granted. After hearing, the Court below dismissed the petition for a *mandamus*, and the relator appealed to this Court.

The agreed statement of facts shows that on the seventh day of October, eighteen hundred and ninety-two, the relator laid thirty feet of the tracks of its railway on one of the streets designated as its route. It also shewed that at the time of the approval of the ordinance some portion of some of the streets, over which the track was to run, was ungraded and unpaved, and still is ungraded and unpaved. It also shewed that the Mayor had refused to give his approval of the tearing up the streets, because he believed that the relator had not complied with the provisions of the ordinance approved April 19th, eighteen hundred and ninety-two, and had not commenced the construction of the road within the time required by it, and had not completed it within the time so required. In the argument of the case, besides contending that the work on the road had been commenced in due time, the counsel for the railroad contended that by the true construction of the twelfth section of the ordinance it was not required to commence the work within six months after its approval, because some portions of the streets over which the tracks were to run were not at that time graded and paved. And it was contended that for the same reason the obligation to complete the road within twelve months after the approval of the ordinance

was removed, and that it was not required to complete it until twelve months had expired after all the streets had been graded and paved which were ungraded and unpaved at the time when the ordinance was approved.    Upon this basis it is maintained that the relator had the right to use the streets for the construction of its road, and that the Mayor, when he refused the desired permission, committed an error which the Court ought to correct by the writ of *mandamus.*    Let us consider the nature of the duty which the Mayor was required to perform in this regard.    The ordinance which requires the permit from the Mayor was not necessary to protect the streets from mere trespassers. The police force, in the ordinary discharge of its duties, was adequate to deal as effectually with them as with other law-breakers.    But there are other persons of a far higher character who reasonably believe that they have a right to dig up the streets in the prosecution of their lawful business.    It was not considered expedient that they should decide the question of right for themselves.    The ordinance places the decision of the question, in the first instance, in the hands of the Mayor, by enacting that without his approval the streets shall not be torn up " under any pretext, or for any cause whatever."    It does not enact, and could not competently enact that the Mayor's decision should control the judgment of the Courts in any suit where they should have jurisdiction of the question.    But it imposes on him the duty of deciding whether, under given circumstances, it is proper that the streets should be dug up.    He is required to decide the question for himself; the ordinance does not subject his judgment to the control of any other person, official or unofficial.    In deciding whether he would approve the permit in the present case, he would necessarily determine whether the relator had a right under the ordinance to use the streets for its railways.    To do this, he would be obliged to exercise his judgment in construing the twelfth section of the ordinance.    He would be confronted with the question whether the laying of thirty feet of the tracks,

and then stopping, was such a commencement of the work as was contemplated by the ordinance, or whether it was a merely illusory act.    If he decided that this was not a real commencement of the work, he would then consider whether the ordinance should be interpreted as meaning that the limitation of six months for the commencement of the work was inapplicable, if any of the streets lying in the route of the railway were unpaved and ungraded at the time when the ordinance was approved.    And he would also have to determine whether, under the same circumstances, the relator was relieved from the obligation to complete the work within twelve months.    The duty of approving or disapproving the permit imposed on the Mayor, thus requiring the exercise of judgment and discretion, it cannot be controlled by the writ of *mandamus.*    The authorities are uniform and consistent that it cannot issue in such a case, but only where the act is merely ministerial.    In *United States* v. *Seaman*, 17 Howard, 225, the Supreme Court sums up its reasons why the writ should not issue against the respondent in that case, in these words : " He was obliged, therefore, to examine evidence, and form his judgment before he acted; and, whenever that is to be done, it is not a case for a *mandamus.*"    And it contrasted the case before it with *Kendall* v. *Stokes*, 12 Peters. 524, where a *mandamus* was issued against the Postmaster-General commanding him to enter in the books of the department a credit in favor of the relators, which had been ascertained and fixed by law, and to which the Court said their right ought to be considered as irreversibly established.    Of this case, the Court, speaking of the Postmaster-General, said: " He was merely to record it.    His duty, under that act of Congress, was like that of a Clerk of a Court, who is required to record its proceedings ; or of an officer appointed by law to record deeds which a party has a right by law to place on record ; or of the register of the treasury of the United States, to record accounts transmitted to him by the proper accounting officers, to be recorded.    The duty in such cases

is merely ministerial; as much so as that of a sheriff or marshal to execute the process of a Court." After the repeated decisions of this Court to the effect that a *mandamus* will not issue in any case where discretion and judgment are to be exercised by a public officer, we do not think it any longer a subject for discussion. *Green* v. *Purnell*, 12 Maryland, 336; *Devine* v. *Belt*, 70 Maryland, 352; *Madison* v. *Harbor Board*, 76 Maryland, 398; *Wailes* v. *Smith, Comptroller*, 76 Maryland, 477, and many other cases.

The counsel for the relator argue that by the proper construction of section 12 of the ordinance of April 18th, eighteen hundred and ninety-two, it has the right to construct the road, and that, therefore, it was the Mayor's duty to approve the permit to tear up the streets. The inference is drawn that we ought to compel him to do so by *mandamus*. But, as the Mayor's judgment is to decide this question, we cannot entertain an appeal from his decision by means of this writ, and thus revise and reverse his determination. As a matter of course, if, in a case where we have jurisdiction, a suit involving the construction of the ordinance should come before this Court, we would not be bound by the Mayor's opinion, but would pronounce such judgment as we thought to be right. In *Decatur* v. *Paulding*, 14 Peters, 497, the widow of Commodore Decatur claimed a sum of money under a joint resolution of the Senate and House of Representatives. The Secretary of the Treasury, upon his construction of the resolution, in connection with an Act of Congress passed on the same day, decided that she was not entitled to the money; and thereupon she applied for a *mandamus* to compel him to pay her. The Supreme Court, after saying that the Secretary must exercise his judgmment in expounding the laws and resolutions of Congress, under which he is required to act, proceeded as follows: "If a suit should come before this Court, which involved the construction of any of these laws, the Court certainly would not be bound to adopt the construction given by the head of a department. And, if they

supposed his decision to be wrong, they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the Act of Congress, in order to ascertain the rights of the parties in the cause before them. The Court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment. Nor can it, by *mandamus*, act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties." For these reasons, I think that we must affirm the judgment of the Court of Common Pleas.

(Filed April 4th, 1895.)