HARRY C. JONES, Commissioner, *v.* HOUSE OF REFORMATION.

[No. 90, October Term, 1938.]

*Decided January 12th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Charles T. LeViness, 3rd, Assistant Attorney General,* with whom were *Herbert R. O'Conor, Attorney General,* and *Hilary W. Gans, Deputy Attorney General,* on the brief, for the appellant.

*Joseph Harlan* and *Charles C. Marbury,* with whom were *Harlan & Harlan* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

By Chapter 392 of the Acts of 1870 of the General Assembly of Maryland, the House of Reformation was incorporated, and since that time, as a private corporation, has exercised its functions in behalf of underprivileged colored boys. Its charter has been amended a number

of times since the original incorporation; and its rights and powers, except as changed in the manner to which reference is hereinafter made, are now set forth in article 27, sections 591 to 611, inclusive, of the Code of Public General Laws. About the time of its incorporation it established a reform school, located at Cheltenham in Prince George's County, and gradually accumulated property, until in 1935 it had acquired 1200 acres of land, improved by buildings adapted to its purposes, equipped with stock for farming purposes and other personal property, of a total value in excess of $400,000. The inmates of the institution in said year numbered more than 400 colored boys committed to it by courts of criminal jurisdiction throughout the state, at a cost of $200 per year per boy, the same being paid by the county or city unit from which the inmate was committed. In addition to the sum realized for the above service, the State of Maryland paid to the corporation a lump sum of $20,000 per year. This situation with reference to the institution prevailed until the passage of chapter 70 of the Acts of 1937, which added eleven new sections, to follow immediately after section 611 of article 27, in substance designed to authorize and empower the State of Maryland to accept title to all the property of the corporation and establish a state institution, to be known as the "Cheltenham School for Boys," and to be a public agency of the State for the care and reformation of colored male minors committed or transferred to its care under the laws of the State.

Section 611-B of the 1937 Acts provides that the House of Reformation, the appellee in this case, in consideration of the State of Maryland assuming its obligations to the colored male minors then under its custody and care, is authorized and empowered to transfer all of its property of every kind and description to the State of Maryland as of October 1st, 1937, except, however, the sum of $30,000, which sum the Act provides could be withheld by the corporate body, the House of Reformation, and be disbursed from time to time by the board of

managers of said House of Reformation, in its discretion, for the uses and purposes of the Cheltenham School for Boys, or for the benefit of past and present employees of the House of Reformation, or both; the Act providing the manner in which the fund reserved by the corporation should be invested, and that any unexpended balance of principal and interest after ten years from October 1st, 1937, should be paid over by the board to the treasurer of the State of Maryland, and thereupon the board would take steps to effect the dissolution of the House of Reformation corporation. The Act then names the board of managers of Cheltenham School for Boys, provides the manner in which their successors shall from time to time be chosen, defines their duties and fixes their compensation; and section 611-D provides, in part: "And the Board of Managers of the Cheltenham School for Boys shall appoint all new employees from lists provided by the Commissioner of State Employment and Registration; provided, however, that upon the transfer of the property as aforesaid, the present employees of The House of Reformation shall become employees of the Cheltenham School for Boys, and shall continue in the discharge of their present functions and duties as classified service employees of the State of Maryland under Article 64-A of the Annotated Code of Maryland, title 'Merit System,' without need of special examination as to fitness, and they shall have all the rights and privileges accorded State employees the same as if they had been State employees from the time of their employment by the House of Reformation, or from the time said Merit System went into effect."

The record shows that between the passage of the Act of 1937 and October 1st of said year, the time limited by the Act for the formal transfer of the property to the State, Harry C. Jones, State Employment Commissioner, the appellant in this case, who by virtue of his office is charged with the administration of the Merit System, sought the opinion of the Attorney General as to whether, upon the transfer of the property to the State, he, as

such commissioner, would be authorized to conduct classification tests for employees of the Cheltenham School for Boys thereby brought into the Merit System under the provisions of the Act of 1937; and that the Attorney General, in reply to the inquiry, instructed the Commissioner that the language of section 611-D of the Act brought into the Merit System a number of persons who had not theretofore taken any examination or obtained a rating under the system, and that the Commissioner was required by the Act to accept them into the system and was authorized to give them classification tests in order to determine in which of the many Merit System classifications such new employees might respectively fall; the Attorney General adding that such classification would be for the benefit of the employees as well as the uniformity of the State service, because by obtaining a classification they would then be in a position to secure other employment in the State, in event of a possible lay-off at the Cheltenham School for Boys.

This correspondence between the Commissioner and the Attorney General led to apprehension on the part of Enoch Harlan, president of the House of Reformation, who thereafter interviewed the Commissioner and obtained from him the information that it was the intention of the Commissioner, promptly after October 1st, if the House of Reformation had been turned over to the State in the meantime, to send to every employee of the school a blank application, to be filled in and sent to the Employment Commissioner, for a position as an employee of the State of Maryland; that he would then hold examinations and determine the proper classification of each person applying, and his fitness for the position applied for; that in case the applicant was not, in his judgment, fitted for the position applied for, the Commissioner would designate the classification to which the applicant would be relegated; that if the applicant failed to qualify, in the judgment of the Commissioner, for the post he was then filling at the school, the applicant would not be permitted to longer fill such position, and it would be

necessary for the position to be filled from the classified list of state employees; and finally, that if the board of managers of the school should attempt to retain any one in his or her old position, after the Commissioner had decided such person was not fitted for such position, then he would not permit the salary to be paid to that person.

The result of this interview caused Mr. Harlan, on May 15th, 1937, to write to the Attorney General, setting forth the attitude of the Commissioner as to his duties in the premises; in which letter, in part, the writer stated: "This is so contrary to my understanding of both the letter and spirit of the Act that I am writing you for a clarification of the matter. The Commissioner says that the Cheltenham employees cannot, in his judgment, become state employees, with all the rights and privileges accorded state employees under the Merit System, unless he examines and classifies them. This matter of the present employees becoming entitled to all the rights and privileges of state employees under the Merit System is rather negligible, as I understand it. The principal benefit is that the employee, if laid off at Cheltenham, would be eligible for a position in some other Maryland state institution, and very few, if any, of the Cheltenham employees would be interested in a position elsewhere. I have no objection to their being examined and classified, but I do object to any employee that is satisfactory to the board being removed from his position by the Commissioner's refusing to pay the wages or salary."

In reply to the above letter, the Attorney General, on May 21st, wrote Mr. Harlan as follows: "I have your letter of May 15th in which you bring to my attention certain matters concerning the induction of employees at Cheltenham into the Merit System. Although I suppose you already have seen our opinion to Employment Commissioner Harry C. Jones, on this subject, I take pleasure in enclosing a copy thereof for your files. I do not think you have any cause for apprehension that any employees will be dropped or discharged as a result of this ruling. By the terms of the Act all of the present employees at

Cheltenham are brought into the State service and in doing so it is customary that some rating be given these persons to determine in what classifications they should be placed. This is the same procedure which was followed when the employees of the Board of State Aid Charities were brought into the State service two years ago."

Other correspondence, between the State Budget Director and the Attorney General, found in the record, culminated in the following summary of the Attorney General's opinion, as of June 24th, 1937, with reference to the subject of controversy: "(1) That the Commissioner may, in his discretion, proceed to classify these employees at any time they are inducted into the State service. (2) That these employees may not be discharged, dismissed or demoted as a result of such classification tests, since the statute provides that they shall continue to discharge 'their present functions and duties.' In taking over Cheltenham it is important that the statute be scrupulously followed. It is apparent that the Legislature intended that all present employees of the institution be inducted into the Merit System in the positions they held before the Act was passed."

It was under this status that the House of Reformation formally conveyed and delivered its property to the State in accordance with the Act of 1937; and from October 1st, 1937, to March, 1938, inclusive, the employees of the House of Reformation at the time of the transfer were paid by the State; the pay rolls for such employees being regularly certified by the appellant as Employment Commissioner, as provided by the general law of the State. It appears, however, that during the period in which all the employees were being paid by the State, the Commissioner conducted an examination of them for the purpose of classification, and that on March 4th, 1938, he advised the board of managers of the Cheltenham School that the result of his examination of the then fifty-seven employees was to place them in three groups, as follows: Group 1, containing the names and assigned

Merit System classification titles of twenty-two employees who had been found to possess the minimum qualifications for the positions which they then held; group 2, containing the names of nine employees to whom, for reasons given in each case, no Merit System classification title could then be assigned, and whose further disposition was dependent on future administration policies of the board of managers; and group 3, containing the names of twenty-six employees who had been found not to possess the minimum qualifications for the positions then held by them, and to whom no Merit System classification would be assigned. Accordingly, when the April pay roll was presented to the Commissioner for certification, he refused to certify the same because it embraced the pay of twenty-six employees covered in his third group. This ruling resulting in the severance of the pay roll and the certification by the Commissioner as to employees embraced in the first and second groups above mentioned, which latter employees have been since continuously paid by the State.

In this situation the House of Reformation, on June 24th, 1938, filed in the Superior Court of Baltimore City a petition substantially setting forth what has already been stated in the foregoing narrative of the case; and praying that a writ of mandamus be issued, directed to the State Employment Commissioner, commanding him to certify and approve the supplemental pay rolls referred to in the petition, containing the names of employees of the institution whose pay roll the Commissioner had refused to certify, and the respective amounts due them for the months of April, May and June. The petition was demurred to by the appellant, who, upon the overruling of his demurrer, filed an answer admitting all of the material allegations in the petition, and concluding by setting forth the result of the detailed examinations of the employees made by the Commissioner as hereinbefore stated, and an argument in support of his findings. The court sustained the appellee's demurrer to that portion of the answer containing the detailed reports

and the argument justifying the same, with leave to answer further; and, the appellant having declined to supplement his answer, the case was heard and decided upon the pleadings, no testimony being taken. From the order of that court, directing that the writ of mandamus be issued as prayed, passed on September 22nd, 1938, this appeal is taken.

Briefly, two questions are presented by the record: (1) Has the appellee a sufficient legal interest in the controversial questions to sustain a writ of mandamus? (2) Are the parts of the Act of 1937, establishing the Cheltenham School for Boys, which purport to place under the Merit System all of the former employees of the appellee, in such conflict with the general Merit System law, Code, art. 64-A, as to be unconstitutional?

Considering these questions in the order of their sequence, it may be observed that the purpose of the writ of mandamus is not to establish a legal right, but to enforce one which has already been established; and it therefore follows that the legal right of the appellee or relator to the performance of the particular act of which performance is sought to be compelled must be clear and complete. Stated differently, the party applying for the writ must show a clear legal right in himself and a corresponding imperative duty on the part of the defendant; and without the establishment of such clear legal right and duty, the writ should be denied. 56 *C. J.*, 582; *State, ex rel. Henderson v. Taylor*, 59 Md. 338; *Caroline County v. Hinson*, 126 Md. 470, 95 A. 48; *Brown v. Bragunier*, 79 Md. 234, 29 A. 7; *State v. Latrobe*, 81 Md. 222, 238, 31 A. 788; *Wailes v. Smith*, 76 Md. 469, 476, 25 A. 922; *Curlander v. King*, 112 Md. 518, 77 A. 60.

Applying the settled principles enunciated in the above cited cases to the facts in the instant case, it is apparent that the retention of its then employees by the State, as provided for in the Act of 1937, was made a condition precedent to the transfer of its valuable property to the State by the appellee, and that therefore it has a clear legal right to insist that the above condition be fully per-

formed; furthermore, that this right placed upon the State Employment Commissioner the corresponding duty to certify pay rolls for the payment of salaries due certain employees of the Cheltenham School for Boys, which employees have admittedly rendered services to the above institution as a State agency under the authorization of the board of managers of the school, as provided in the Act; and this regardless of article 64-A, for the reason, as has been indicated, that the employees involved in this controversy are definitely excluded from the provisions of the above article by the Act of 1937.

If, however, the above facts in connection with the acquisition of the property of the appellee by the State do not in themselves vest in the appellee a sufficient legal right to maintain its position as relator in the case before us, it is contended that it has a direct and special interest, sufficient in itself to maintain such position. This latter contention is based upon a fact which is alleged in the appellee's petition for the writ, and is admitted in the answer of the appellant; and that fact is, that since the refusal of the Commissioner to certify the pay rolls, the appellee has been advancing money to the employees whose pay rolls have been rejected by the Commissioner, for the purpose of enabling them to continue in the service of the school until such time as the matter of their rights may be adjudicated. These payments, it is admitted, have been made from the special fund reserved by the appellee under the Act for the purposes set forth therein; and pending the litigation arising from this controversy, through its action in this respect, and only because of such action, the school has been enabled to continue its functions and thereby care for its inmates.

In *McCarthy v. Street Commrs. of Boston*, 188 Mass. 338, 74 N.E. 659, it is said: "Although originally a prerogative writ, a petition for a writ of mandamus may now be brought by any one having a private right for the enforcement of which the law provides no other adequate and effectual remedy, and where there would otherwise be a failure of justice. See *Selectmen of Gardner v.*

*Templeton St. R. Co.*, 184 Mass. 294, 297, 68 N.E. 340. And it has been held by the Supreme Court of the United States in *Union Pac. R. R. Co. v. Hall*, 91 U.S. 343, 354, 23 L.Ed. 428, *et seq.*, that it can be sued out by a private person to enforce the performance of a public duty, contrary to a *dictum* by Chief Justice Shaw in *Wellington, Petitioner*, 16 Pick. 87, 105. * * * The issuing of the writ, however, is not a matter of right, but of sound judicial discretion."

In the early case of *Sanger v. Kennebec County*, 25 Me. 291, the court, in denying a petition for mandamus to compel the commissioners to improve a highway, said: "A private individual can apply for this remedy only in those cases, where he has some private or particular interest to be subserved, or some particular right to be pursued or protected by the aid of this process, independent of that which he holds in common with the public at large; and it is for the public officers, exclusively to apply, when public rights are to be subserved." The same principal is sanctioned in the case of *Pumphrey v. Baltimore*, 47 Md. 145, wherein it is said: "All the authorities concur in support of the proposition, that where the petitioner has a personal interest in the matter, different in kind from that of the general public, he is entitled to the writ." In the above case, it may be added, this court quoted with approval from *Union Pac. R. R. Co. v. Hall, supra*, the following language: "There is a decided preponderance of American authority in favor of the doctrine that private persons may move for mandamus to enforce a public duty, not due to the government as such, without the intervention of a government law officer."

We are not unmindful of the fact that mandamus will not lie for an alleged breach of contract; nor do we understand from the petition filed in the instant case that the appellee is seeking to enforce a contract. In other words, while we do not hold that it entered into a contract with the State when it voluntarily deeded its property to the latter, we are of the opinion that, in view of

its own gratuity to the State, the latter, through a solemn legislative act, has vested it with certain rights which it now seeks to enforce. In 2 *Poe, Pl. & Pr.*, sec. 709, p. 665, in dealing with the functions of the writ, it is stated: "It is accordingly a proceeding at law, where the purpose of the appellant is not to recover damages for a wrong done, nor to enjoin a party from committing a threatened wrong, but to compel the performance of a positive act in cases where such remedy is alone adequate to meet the justice of the particular case"; and in section 710, p. 669: "In general terms, it may be said that it will always lie to compel the performance by a public officer of a merely ministerial act in which the applicant has a sufficient interest."

In support of its contention that the appellee is not a proper party to the suit, it is submitted by the appellant, although not conceded, that if, under the facts of the case now being considered, a right to petition for the writ is existent, such right is vested in the employees involved in the controversy, and not in the appellee. In our view of the case, however, it becomes unnecessary to decide whether the individual employees, whose pay rolls have been refused certification by the Employment Commissioner, could have brought separate petitions for the writ. It is obvious that if such had been the procedure, in view of the small amounts involved as to each employee, respectively, the result would have been, in effect, a practical denial of justice. Furthermore, the policy of the law is to avoid a multiplicity of suits; and if, as we conclude under the peculiar facts of the instant case, the appellee is correct in its premises, it is in the interest of justice that the rights of these employees be established by a single proceeding.

Considering now the second question above indicated, namely, whether the Act of 1937 is a special law within the meaning of that part of article 3, section 33, of the Constitution of Maryland, which provides that the General Assembly shall pass no "special law for any case for which provision has been made by an existing general

law," it may be observed that the above provision of the organic law of this State has been before this court in numerous cases, and that in the disposition of those cases narrow distinctions have necessarily developed, because of the varying facts and circumstances under which they have arisen.

A careful review of the opinions of this court on this important question, however, leads to the conclusion that it has uniformly held the term "special law" to mean "a special law for a particular case." In *Montague v. State,* 54 Md. 481, one of the earlier cases, it is said: "The provision immediately following in the same section, that 'the General Assembly shall pass no special law for any case for which provision has been made by an existing general law,' has been construed as intended to prevent special legislation in special cases (*McGrath v. State,* 46 Md. 631), and we think it very clear from the enumeration made that the object of the preceding provisions was to prevent or restrict the passage of special, or what are more commonly called private Acts, for the relief of particular named parties, or providing for individual cases. In former times, as is well known and as the statute books disclose, Acts were frequently passed for the relief of named individuals, such as sureties upon official bonds, sheriffs, clerks, registers, collectors and other public officers, releasing them sometimes absolutely, and sometimes conditionally from their debts and obligations to the State. The particular provision now invoked was aimed against the abuses growing out of such legislation, and its object was to restrain the passage of such Acts, and to prevent the release of debts and obligations in particular cases, and in favor of particular individuals unless recommended by the Governor or the Treasury officials." And in the recent case of *Norris v. Baltimore,* 172 Md. 667, 192 A. 531, after quoting from the above case, Judge Offutt drew the following deduction as to the purpose and meaning of the constitutional provision: "It appears to be well settled that a law intended to serve a particular need, to meet some special evil, or to pro-

mote some public interest, for which the general law is inadequate, is not a special law within the meaning of that term as used in that section of the Constitution." 59 *C.J., "Statutes,"* sec. 318, 258, note 8; 6 *R.C.L.* 420; *Grossfeld v. Baughman,* 148 Md. 30, 339, 129 A. 370; *Baltimore v. United Rys. Co.,* 126 Md. 39, 54, 94 A. 378; *O'Brian v. County Commrs.,* 51 Md. 15, 23; *Lankford v. Somerset Co.,* 73 Md. 105, 117, 20 A. 1017, 1020, 22 A. 412.

Hence, while the constitutional provision was wisely designed to prevent the dispensation or grant of special privileges to special interests, through the instrumentality of special legislation, in conflict with previously enacted general legislation covering the same subject matter, it was never intended, nor has this court ever held, that the framers of the Constitution intended to foreclose to the sovereign the right to pass special legislation "to serve a particular need, to meet some special evil, or to promote some public interest, for which the general law is inadequate." Illustrative of the above deduction will be found the case of *Baltimore v. United Rys. Co., supra,* wherein, from the city's standpoint, an admittedly advantageous understanding for the purpose of taxation was reached with the railway company. The arrangement made by the city under the special act ultimately effectuated a beneficial change in the latter's taxable basis, as against the railway company, but presently contemplated a transition period in which the company meanwhile reaped some apparent advantage. The case was decided by this court upon the theory that any temporary benefit that might for a time balance the scales in favor of the tax obligations of the company was more than offset in the public interest, by the city, for the ultimate benefit accruing to it; and it was there said: "One of the most important reasons for the provision in the Constitution against special legislation is to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others. * * * The property wanted by the city belonged to the appellee, and no

one can carefully read this statute without being convinced that it was passed in the interest of the city, and not for the benefit of the railway company. Courts should not be too ready to strike down such legislation on the theory that the same thing could have been worked out under existing general laws. It is said in 6 *R.C.L.* 417 (section 413) : 'In cases of state constitutional prohibition against the passage of special laws where a general law may be made applicable, it is a rule that the question of applicability * * * is one for the Legislature to determine, and that such a statute will not be declared unconstitutional, except where it clearly appears that the Legislature was mistaken in its belief that a general law could not be made applicable.' * * * 'An important test in determining whether legislation is special or general is to consider not the form merely, but the substance'."

Again, in *Williams v. Baltimore*, 289 U. S. 36, 53 S.Ct. 431, 77 L.Ed. 1015, a case involving the constitutionality of an act of the General Assembly of this State, exempting from taxation for the period of two years the property of a single railway company, wherein the statute was held not repugnant to the above section of the Constitution, the following excerpt from the opinion of the late Justice Cardozo is striking appropriate to the facts in the instant case: "The highest court of Maryland has considered this provision, and defined its meaning and effect. *Police Pension Cases*, 131 Md. 315, 101 A. 786; *Baltimore v. United Rwys. & Electric Co.*, 126 Md. 39, 94 A. 378; *Baltimore v. Starr Church* [106 Md. 281, 67 A. 261], *supra; Littleton v. Hagerstown*, 150 Md. 163, 132 A. 773; *O'Brian v. Baltimore County*, 51 Md. 15; *Hodges v. Baltimore Union Pass. R. Co.*, 58 Md. 603. There has been need, now and again, to develop close distinctions. Our endeavor in what follows is to extract the essence of the decisions and to give effect to it as law. Time with its tides bring new conditions which must be cared for by new laws. Sometimes the new conditions affect the members of a class. If so, the correcting statute must apply to all alike. Sometimes the new con-

ditions affect one only or a few. If so, the correcting statute may be as narrow as the mischief. The Constitution does not prohibit special laws inflexibly and always. It permits them when there are special evils with which existing general laws are incompetent to cope. The special purpose will then sustain the special form. *Baltimore v. United Rys. & Electric Co., supra.* The problem in last analysis is one of legislative policy, with a wide margin of discretion conceded to the lawmakers. Only in cases of plain abuse will there be revision by the courts. *Baltimore v. United Rys. & Electric Co., supra,* at page 52 of 126 Md., 94 A. 378. If the evil to be corrected can be seen to be merely fanciful, the injustice or the wrong illusory, the courts may intervene and strike the special statute down. *Baltimore v. Starr Church, supra.* If special circumstances have developed, and circumstances of such a nature as to call for a new rule, the special act will stand. *Police Pension Cases, supra."*

While it is true that the Act provides that the employees of the House of Reformation, taken over as a body by the State at the time of the transfer of the corporate property of the State, "shall have all the rights and privileges accorded State employees the same as if they have been State employees from the time of their employment by the House of Reformation, or from the time said Merit System went into effect" (section 611-D), it seems obvious to us that the above language, in so far as the application of the Merit System is involved, limits the service of said employees to such work as they were respectively performing at the time of the transfer to the service of the State. This construction is strengthened by words preceding the above quotation from the Act, as follows: "And the Board of Managers of the Cheltenham School for Boys shall appoint all new employees from lists provided by the Commissioner of State Employment and Registration; provided, however, that upon the transfer of the property as aforesaid the present employees of The House of Reformation shall become employees of the Cheltenham School for Boys, and shall continue in the

discharge of their present functions and duties." In other words, the purpose of the Act, as we construe it, in this respect, was to permit the employees to continue in their employment without subjecting them to the test contemplated by the general Merit System; and for the purpose of service only in the same capacity in which they were serving at the time of the passage of the Act, or in some other capacity connected with the institution, the Act designed to place them under the Merit System. It does not follow, however, that this provision, which in its very nature is temporary and limited to the employees involved, will appreciably affect the Merit System Law, because, by the explicit terms of the Act of 1937, the successors of these employees are subject to all the provisions of the Merit System Law. Nor does it follow that the employees, placed under the Merit System without undergoing the test provided by the Merit Law, are, in the absence of a test, made eligible by the Act for other public service in the State covered by the general Merit Law.

The proceedings have not been questioned otherwise. Accordingly, the order appealed from will be affirmed.

*Order affirmed.*