# CITIES SERVICE COMPANY ᴇᴛ ᴀʟ. *v.* GOVERNOR, STATE OF MARYLAND ᴇᴛ ᴀʟ.

[No. 154, September Term, 1979.]

*Decided June 30, 1981.*

554

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*James J. Doyle, Jr.,* with whom were *Milton Eisenberg, John T. Boese, Joyce A. Rechtschaffen, Darrell A. Kelsey* and *Phyllis Garbe Merrill* on the brief, for appellants.

*Michael F. Brockmeyer, Assistant Attorney General,* with whom were *George A. Nilson, Deputy Attorney General,*

*Charles O. Monk, II, Gerald Langbaum* and *Timothy J. Shearer, Assistant Attorneys General,* on the brief, for appellees Governor of Maryland et al. *Thomas M. Wilson, III,* with whom were *John B. Isbister* and *Tydings & Rosenberg* on the brief, for appellee Charles T. Gladstone, Jr. *K. Donald Proctor,* with whom were *Richard P. Kidwell* and *Miles & Stockbridge* on the brief, for appellee Southern States Cooperative, Inc. *Francis B. Burch,* with whom was *Robert L. Flanagan* on the brief, for appellee Montgomery Ward & Co., Inc.

*Amicus curiae* brief filed by Tesoro Petroleum Corporation and Tesoro Gasoline Marketing Company, *David Albright, Fred W. Drogula, Patricia N. Blair* and *Franklin T. Caudill* on the brief.

*Amicus curiae* brief filed by The Meadville Corporation, *Wilbur D. Preston, Jr., Gerson B. Mehlman* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief.

ELDRIDGE, J., delivered the opinion of the Court.

In Maryland, producers or refiners of petroleum products are generally prohibited from operating retail gasoline service stations with their own personnel or with a subsidiary company. In 1979, the Maryland Legislature enacted two exceptions to this prohibition, one of which, it is claimed, in practical effect allows only one producer and refiner of petroleum products (the Mobil Corporation) to continue operating retail gasoline service stations through one of its wholly owned subsidiaries (Montgomery Ward & Co., Inc.). The principal questions in this case are whether that exception constitutes a prohibited "special law" under Art. III, § 33, of the Maryland Constitution and whether it denies to other producers and refiners of petroleum products equal protection of the laws. The statutory background and underlying facts are as follows.

The Legislature, by Ch. 854 of the Acts of 1974, provided, *inter alia,* that after July 1, 1974, no producer or refiner of petroleum products shall *open* a retail service station in

Maryland and operate it with company personnel or a subsidiary company. In Ch. 608 of Acts of 1975, the Legislature went further and required that after July 1, 1975, no producer or refiner of petroleum products shall operate any retail service station in Maryland with company personnel or a subsidiary company, regardless of when the station may have been opened, and that all stations must be operated by retail service station dealers. Pursuant to the statute and regulations thereunder, the July 1, 1975, deadline for producers or refiners to divest themselves of company-operated retail service stations was extended to July 13, 1979. These provisions, commonly referred to as the "Divestiture Law," are codified in Maryland Code (1957, 1979 Repl. Vol., 1980 Cum. Supp.), Art. 56, § 157E (b), (c), (g), (h) and (i).

In 1974 and 1975, several producers and refiners challenged, *inter alia,* the constitutionality of the Divestiture Law on the grounds that it violated the Due Process clauses of the Fourteenth Amendment and the Maryland Declaration of Rights, that it discriminated against and unduly burdened interstate commerce in violation of the Commerce Clause, Art. 1, § 8, of the United States Constitution, that it constituted a taking of property without just compensation in violation of the Fifth Amendment and Art. III, § 40, of the Maryland Constitution, that it denied producers and refiners the equal protection of the laws in violation of the Fourteenth Amendment and the Maryland Declaration of Rights, that it constituted an unlawful delegation of legislative authority to the Comptroller in violation of Art. 8 of the Maryland Declaration of Rights, and that the terms "producer" and "refiner" were unconstitutionally vague. This Court rejected all of these contentions and upheld the constitutionality of the Divestiture Law with respect to these grounds in *Governor v. Exxon Corp.,* 279 Md. 410, 370 A.2d 1102, 372 A.2d 237 (1977). On appeal to the United States Supreme Court, the producers and refiners limited their constitutional attack upon the Divestiture Law to Fourteenth Amendment Due Process and Commerce Clause grounds. The Supreme Court, rejecting their contentions, affirmed the judgment of this Court. *Exxon Corp. v.*

*Governor,* 437 U.S. 117, 98 S. Ct. 2207, 15 L. Ed. 2d 91 (1978).

In 1979, after the decisions in the *Exxon* case, the Maryland Legislature amended the Divestiture Law in two respects. By Ch. 368 of the Acts of 1979, Code (1957, 1979 Repl. Vol.), Art. 56, § 157E (i), the Legislature exempted from the Divestiture Law gasoline service station facilities which were both owned and operated, on January 1, 1979, by an agricultural cooperative association which met certain criteria.[1] By Ch. 659 of the Acts of 1979, codified as Art. 56, § 157E (c) (2), the Legislature exempted from the divestiture requirement a retail service station in operation on January 1, 1979, that was operated by a subsidiary of a petroleum producer or refiner as of January 1, 1979, on a year to year basis as long as the subsidiary's gross revenues from petroleum products sold in Maryland are less than two percent of the subsidiary's gross revenues from all retail operations in Maryland. This exemption, commonly referred to as the "mass merchandiser exemption," did not permit the qualifying subsidiary to open new service stations but only to continue operating those already existing.[2]

---

**1.** The new language in subsection (i) is as follows:

"(i) For the purpose of subsections (b) and (c) of this section, a retail service station may not include facilities which were both owned and operated on January 1, 1979 by an agricultural cooperative association which a bank for cooperatives certifies is eligible to borrow from it pursuant to Subchapter III of the federal Farm Credit Act of 1971 (12 U.S.C. § 2121 et seq.) provided that:

"(1) The certification is filed with the Comptroller of the Treasury in connection with the registration of retail service station dealer pursuant to this subtitle;

"(2) The agricultural cooperative association owned and operated on January 1, 1979, a place or places of business where motor vehicle fuel is sold and delivered into the tanks of motor vehicles; and

"(3) The facilities are on premises owned and operated by the agricultural cooperative association also carries on, as a bona fide part of its business, the sale or furnishing of farm supplies, farm business services, or the bulk distribution of motor vehicle fuel to farmers on farms."

**2.** Subsections (b) and (c) of Art. 56, § 157E, as amended in 1979 by the mass merchandiser exception, state (emphasis supplied):

On September 27, 1979, Cities Service Company, a producer and refiner of petroleum products, filed in the Circuit Court of Baltimore City a bill of complaint for declaratory and injunctive relief against the Governor, Attorney General and Comptroller of Maryland.[3] Cities Service claimed that the agricultural cooperative and mass merchandiser exemptions, added in 1979 to the Divestiture Law, rendered the entire Divestiture Law unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and the similar equal protection guarantee in Article 24 of the Maryland Declaration of Rights.[4] Cities Service contended that the distinctions made between the different classes of producers and refiners, permitting only very limited types of producers and refiners to operate retail service stations, had

---

"(b) Subject to the provisions of subsection (i) of this section, after July 1, 1974, no producer or refiner of petroleum products shall open a major brand, secondary brand or unbranded retail service station in the State of Maryland, and operate it with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation, managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(c)(1) Subject to the provisions of subsection (i) of this section, except as otherwise provided in this subsection, after July 1, 1975, no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(2) A retail service station in operation on January 1, 1979, that is operated by a subsidiary of a producer or refiner of petroleum products as of January 1, 1979 referred to in this subsection *shall be exempt from year to year from paragraph (1) of this subsection* for the fiscal year beginning July 1, of each year, if the subsidiary's gross revenues from the sale of petroleum products in this State for the preceding calendar year is less than 2 percent of the subsidiary's gross revenues from all retail operations in this State for the preceding calendar year."

**3.** Cities Service had been granted an extension of the time limit for divesting itself of company-operated stations from July 13, 1979, until September 30, 1979.

**4.** Although the Maryland Constitution contains no express equal protection clause, it is settled that the concept of equal protection is embodied in the Due Process Clause. Article 24 of the Maryland Declaration of Rights. Attorney General v. Waldron, 289 Md. 683, 703-705, 426 A.2d 929, 940-941 (1981); Board v. Goodsell, 284 Md. 279, 293 n.7, 396 A.2d 1033, 1040 (1979).

no rational basis and were thus unconstitutionally discriminatory. The plaintiff sought a declaration that the Divestiture Law and regulations thereunder were unconstitutional under the equal protection guarantees of the federal and state constitutions, a temporary injunction restraining the defendants from enforcing the law and regulations against Cities Service during the pendency of the action, and a permanent injunction against the enforcement of the law and regulations.

The day after the filing of Cities Service's bill of complaint, the Circuit Court issued a temporary injunction, permitting Cities Service to continue operating its existing company-operated retail gasoline stations in Maryland but not allowing Cities Service to open new company-operated stations or to convert existing dealer-operated stations to company operations. The temporary injunction, pursuant to a subsequent court order, was extended until October 21, 1979.

Shortly after filing its bill of complaint, Cities Service filed an amended bill of complaint, alleging that the mass merchandiser exemption "by legislative intent and by practical effect, exempts from the provisions of Section (c) of the divestiture law only those retail outlets operated by Mobil Corporation through its Montgomery Ward subsidiary." It was further alleged that the agricultural cooperative exemption "by legislative intent and by practical effect, exempts from the provisions of the entire divestiture law only those retail outlets operated by Southern States Coop., Inc." Therefore, it was contended, the mass merchandiser and agricultural cooperative exemptions constituted "special laws" prohibited by Art. III, § 33, of the Maryland Constitution. The plaintiff asked that the entire Divestiture Law be declared invalid and its enforcement enjoined, on the basis of Art. III, § 33, as well as the equal protection guarantees of the federal and state constitutions.

On October 2, 1979, Charles T. Gladstone, Jr., a retail service station dealer operating a "Citgo" service station which was owned by Cities Service and which sold Cities Service's brand of gasoline, filed a motion to intervene as a

matter of right under Maryland Rule 208 a. Mr. Gladstone sought intervention as a defendant, representing a class of all certified Maryland retail service station dealers, to oppose the plaintiff's bill of complaint. Mr. Gladstone also filed a second motion for permissive intervention, in his individual capacity, pursuant to Rule 208 b.

On October 8, 1979, one week prior to the trial, the Tesoro Petroleum Corporation and its wholly-owned subsidiary, Tesoro Gasoline Marketing Company, filed a motion to intervene as parties plaintiff, first as a matter of right under Rule 208 a and, alternatively, on a permissive basis under Rule 208 b. An affidavit by the president of Tesoro Gasoline Marketing Company alleged that Tesoro Marketing has no gross revenues from retail operations unrelated to the sale of petroleum products, and that, therefore, it could not qualify under the mass merchandiser exemption. The affidavit, however, further alleged that, under a master-sublease and contract with Lucky Stores, Inc., Tesoro Marketing operates retail service stations in connection with discount department stores operated by Lucky Stores. It was stated that one of these discount department stores is located in Maryland and two others in Maryland were in the process of being opened. Tesoro Petroleum claimed that under the Divestiture Law, it would have to cease operating these retail outlets through its subsidiary Tesoro Marketing after October 31, 1979, the date on which an extension granted by the Maryland Comptroller expired. Tesoro Petroleum contended that Montgomery Ward stores and those operated by Lucky Stores, Inc., were comparable commercial operations, and that both Tesoro Petroleum and Mobil Corp., are "refiners of petroleum products which have subsidiaries operating retail service stations in Maryland with salaried employees on the premises of discount department stores." Tesoro's position was that the distinction drawn by the statute between these two types of operations was arbitrary, capricious and in furtherance of no legitimate state interest.

The trial court denied Mr. Gladstone's motion for intervention of right as the representative of all retail service station dealers. The court found that the interests of the

dealers coincided with the interests of the Governor, Comptroller and Attorney General, that those present defendants could adequately represent the dealers' interests, and that there was no showing that the class of all retail service station dealers would be bound by a judgment entered in the case. The trial court, however, granted Mr. Gladstone's second motion for permissive intervention as a defendant. With regard to the motion for intervention by the two Tesoro companies, the trial court denied the motion as untimely under all of the circumstances but allowed Tesoro to submit an amicus curiae brief.[5]

The trial of the case began on October 15, 1979, and continued until October 19, 1979, with numerous witnesses and exhibits. Among other things, the evidence showed that service station facilities of both Montgomery Ward and Southern States Cooperative were practically identical, physically, to those of any other retail gasoline outlet, that they were accessible from major roads, that they were price competitive and that they provided services substantially similar to those of other service stations. Testimony also disclosed that Montgomery Ward was the only company to apply to the Comptroller and receive an exemption under the mass merchandiser exemption, and that Southern States Cooperative was the only agricultural cooperative to file for and receive an exemption under the agricultural cooperative exemption.

In addition, officials of both Montgomery Ward and Southern States Cooperative explained the nature of their retail businesses and the role played by retail gasoline sales. Montgomery Ward officials stated that the company began selling gasoline at its retail stores as a convenience for its automotive parts and repair customers, that when it plans

---

**5.** The court pointed out that the motion was not filed until October 8, 1979, that the trial was scheduled to begin on October 15, 1979, that the issues raised by Tesoro, while similar to those of Cities Service, "would require a different defense as to the alleged unconstitutionality of the classifications established by the statute," that the defendants had already interviewed several witnesses in various parts of the country in preparation for trial, and that Tesoro's corporate officers are located in Texas and California.

new stores, which are mainly in shopping centers, the retailing of gasoline is one of the last considerations, that Montgomery Ward's policy concerning gasoline sales did not change when it became a subsidiary of Mobil Corp., that Mobil has had no involvement in the retail gasoline operations of Montgomery Ward, and that Mobil does not supply gasoline to Montgomery Ward. One of the Montgomery Ward officials further testified that the company's profits from the sale of gasoline were marginal, that consideration had been given to discontinuing the sale of gasoline, and that Montgomery Ward was interested in the enactment of the mass merchandiser exemption because of its "investments in pumps and facilities, tanks, overhead and everything."

An expert witness presented by the defendants, a professor of marketing at the University of Illinois, testified concerning the dangers to retail gasoline marketing caused by stations operated by producers or refiners, and he further testified that agricultural cooperative and mass merchandiser retail gasoline operations do not present these dangers or have the same anticompetitive effects. Under questioning by the court, the defendants' expert also testified that because of the January 1, 1979, qualifying dates in the agricultural cooperative and mass marketing exemptions, the only company which could come within the agricultural cooperative by exemption was Southern States Cooperative, Inc., and the only company which could come within the mass merchandiser exemption was Montgomery Ward. The expert witness acknowledged that if a competitor of Montgomery Ward, such as Sears Roebuck and Co. or J.C. Penney, became a subsidiary of a producer or refiner of petroleum products, it could not qualify under the exemption because it would not have been such a subsidiary as of January 1, 1979. Another witness for the defendants, an official in the office of the Comptroller of Maryland, agreed that, to the best of his knowledge, Montgomery Ward was the only entity which could qualify under the mass merchandiser exemption.

At the conclusion of the trial, on October 19, 1979, the trial court issued an order consisting of findings of fact, a declaratory judgment and an injunction pending appeal. With respect to the purpose and scope of the 1979 amendments to the Divestiture Law, the court found

> "[t]hat the amendments to the Maryland Divestiture Law as originally passed were enacted for the sole benefit of Southern States Coop., Inc. and Montgomery Ward and that there is no evidence that anyone else could have complied with them originally or can presently comply with them or in the future will be able to comply with them."

The trial court also found that the primary purpose of Cities Service was the retail sale of gasoline, whereas this was not true with regard to Southern States Cooperative or Montgomery Ward. As to the latter two, the court found

> "[t]hat Southern States Coop., Inc. has, as its primary purpose in locating its stores and in its merchandising; the servicing and supplying of the farmer community with products needed by farmers and, as a minor adjunct to that business, the sale of gasoline at retail. That Montgomery Ward has, as its primary purpose in locating its stores and in marketing, the mass merchandising of a host of commodities at retail to the general public and, as a minor adjunct thereto, the sale of gasoline at retail to the general public."

The court further found that the 1979 amendments represented no deviation from the primary purpose of the Divestiture Law and that they had "a rational relationship to the objective of the Maryland Divestiture Law of preserving competition and fairness within the Maryland retail gasoline marketing industry."

In light of the "rational basis" finding, the trial court concluded that the Divestiture Law as amended in 1979 did not violate Cities Service's right to equal protection of the laws. However, the court did conclude that the 1979 amend-

ments were special laws prohibited by Art. III, § 33, of the Maryland Constitution. The court declared invalid the 1979 amendments in their entirety, ordering that they be "stricken from" the Divestiture Law. Nevertheless, the court held that the Legislature, if it had known of the invalidity, would have intended that the original Divestiture Law continue in effect without the amendments. Therefore, the court concluded that the 1979 amendments were severable from the remainder of the Divestiture Law.

Under the trial court's declaratory judgment, neither Cities Service nor Southern States Cooperative nor Montgomery Ward would have been entitled to continue operating their retail service stations in Maryland. Because it found irreparable injury, however, the trial court issued an injunction permitting all three companies to operate their existing Maryland retail service stations until the issuance of this Court's mandate in the case.

Five days after the trial and judgment in the case, Southern States Cooperative filed motions to intervene and for a rehearing or partial new trial; ten days after the trial and judgment, Montgomery Ward filed similar motions. The trial court denied the motions finding that the movants knew of the litigation prior to trial and, with full knowledge that the 1979 amendments might be invalidated, decided then not to intervene.

Cities Service, the defendant state officials, and the defendant Gladstone all took appeals from the court's judgment of October 19, 1979. Gladstone, in addition, appealed from the denial of his motion to intervene of right as the representative of all Maryland retail service station dealers. Southern States Cooperative and Montgomery Ward filed orders of appeal, stating that the appeals were from the orders denying intervention and from the October 19th judgment. Tesoro Petroleum Corporation and Tesoro Gasoline Marketing Company did not appeal from the order denying their motion to intervene, although they have filed an amicus curiae brief in this Court dealing with all of the substantive issues in the case. Prior to any proceedings in the Court of Special Appeals, all appellants filed petitions in

this Court for a writ of certiorari. Because of the importance of the constitutional issues, we granted all of the petitions.

Although all parties are dissatisfied with the judgment of the Circuit Court of Baltimore City, their complaints obviously vary somewhat. The Governor, Attorney General and Comptroller argue that the trial court erred in concluding that the 1979 exemptions were invalid special laws under Art. III, § 33, of the Maryland Constitution; instead, the state defendants maintain that the 1979 amendments are in all respects constitutional. The defendant Gladstone, while agreeing with the position of the state officials on the constitutional questions, chiefly complains of the denial of his motion to intervene as of right. Cities Service primarily contends that the court erred in holding that the 1979 amendments were severable from the remainder of the Divestiture Law. Rather, in its view, principles of statutory construction required that the entire Divestiture Law be declared unconstitutional because of the invalid 1979 amendments. Montgomery Ward, like the state defendants and Gladstone, urges that the trial court's invalidation of the 1979 amendments be reversed; alternatively, Montgomery Ward argues that if this holding of the trial court is not reversed, "the case should be remanded so that Montgomery Ward will not be prejudiced by the decision in this case without having had its day in court." Southern States Cooperative's initial position is that the 1979 agricultural cooperative exemption is not an invalid special law. Southern States then makes several alternate arguments. If the agricultural cooperative amendment is held to be an invalid special law, Southern States contends that the amendment should not be invalidated in its entirety but should be held severable, so that only the January 1, 1979, limitations would be stricken. As another alternative, if the 1979 agricultural cooperative exemption is deemed unconstitutional, Southern States suggests that the entire Divestiture Law ought to be invalidated. As a final alternative, Southern States, like Montgomery Ward, seeks a remand, the grant of its motion to intervene and a new trial.

(1)

Preliminarily, the matter of the 1979 agricultural cooperative exemption can be briefly disposed of. During the pendency of this appeal, the Legislature passed and the Governor signed into law Ch. 867 of the Acts of 1980, which took effect June 1, 1980. This Act repealed the "grandfather clauses" from the agricultural cooperative exemption by deleting the January 1, 1979, qualifying dates.[6] Thus, the exemption broadly applies to the premises of all certified agricultural cooperative associations furnishing farm supplies, farm business services or bulk distribution of motor vehicle fuel to farms. No party has suggested that this broad exemption for agricultural cooperatives is a "special Law" within the meaning of Art. III, § 33, of the Maryland Constitution, or gives rise to an invalid classification under the Equal Protection Clause of the Fourteenth Amendment or under Article 24 of the Maryland Declaration of Rights.

Consequently, the issues in this litigation concerning the validity of the old 1979 agricultural cooperative exemption are essentially moot. Upon remand, the declaratory judgment should be modified by deleting any legal findings and conclusions regarding the 1979 agricultural cooperative exemption.

---

**6.** Subsection (i) of Art. 56, § 157E, as amended in 1980, reads as follows:

"(i) For the purpose of subsections (b) and (c) of this section, a retail service station does not include facilities which are both owned and operated by an agricultural cooperative association which a bank for cooperatives certifies is eligible to borrow from it pursuant to subcharter [Subchapter] III of the Federal Farm Credit Act of 1971 (12 U.S.C. § 2121 et seq.) provided that:

"(1) The certification is filed with the Comptroller of the Treasury in connection with the registration of a retail service station dealer pursuant to this subtitle; and

"(2) The facilities are on premises owned and operated by the agricultural cooperative association at which the agricultural cooperative association also carries on, as a bona fide part of its business, the sale or furnishing of farm supplies, farm business services, or the bulk distribution of motor vehicle fuel to farmers on farms."

(2)

Art. III, § 33, of the Maryland Constitution provides, among other things, that the General Assembly "shall pass no special Law, for any case, for which provision has been made, by an existing General Law . . . ." As the wording makes clear, a statute is not prohibited by the restriction unless two conditions are met: (1) it must be a "special" law; (2) there must be no provision for the matter in an existing general law.

It is said that a prohibited special law under § 33 is "a law for a special case" or for a "particular case" or for "individual cases." *See, e.g., Reyes v. Prince George's County,* 281 Md. 279, 305, 380 A.2d 12 (1977); *Potomac Sand & Gravel v. Governor,* 266 Md. 358, 378, 293 A.2d 241, *cert. denied,* 409 U.S. 1040, 33 S. Ct. 525, 34 L. Ed. 2d 490 (1972); *Jones v. House of Reformation,* 176 Md. 43, 55, 3 A.2d 728 (1939); *Norris v. Baltimore,* 172 Md. 667, 682, 192 A. 531 (1937); *Baltimore City v. Starr Church,* 106 Md. 281, 289, 67 A. 261 (1907); *McGrath v. State,* 46 Md. 631 (1877). However, this definition, although often repeated, is not particularly helpful in applying § 33.

More useful, perhaps, is the concept set forth in *Prince George's Co. v. B. & O. R. Co.,* 113 Md. 179, 183, 77 A. 433 (1910), and other cases, that "[a] special law is one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class." *See Littleton v. Hagerstown,* 150 Md. 163, 176, 132 A. 773 (1926) ("each of the exemptions made by said act is obnoxious to said constitutional inhibition . . . unless it operates upon all within a class"); *Grossfield v. Baughman,* 148 Md. 330, 339, 129 A. 370 (1925) (statute held not to be a special law as "the act affects all of a distinct class within a defined territorial unit"); *M. & C.C. of Balto. v. U. Rwys. & E. Co.,* 126 Md. 39, 48, 94 A. 378 (1915). This definition, however, also provides no mechanical rule for deciding cases, as it depends upon a determination of what constitutes the "class." Thus, legislation aimed at a single named entity was upheld under § 33 because the

entity "constituted a class of itself, and similar conditions did not exist with any other company within the territory to which this statute was applicable." *M. & C.C. of Balto. v. U. Rwys. & E. Co., supra,* 126 Md. at 48-49.

Consequently, in applying § 33 to determine whether an enactment affects less than an entire class and is, therefore, a "special law," this Court has looked to the purpose of the constitutional prohibition. Very early, in *Montague, Ex'r v. State,* 54 Md. 481, 490 (1880), the Court pointed out that the object of the constitutional prohibition

> "was to prevent or restrict the passage of special, or what are more commonly called *private* Acts, for the relief of particular named parties, or providing for individual cases. In former times, as is well known and as the statute books disclose, Acts were frequently passed for the relief of named individuals, such as sureties upon official bonds, sheriffs, clerks, registers, collectors and other public officers, releasing them sometimes absolutely, and sometimes conditionally from their debts and obligations to the State. The particular provision now invoked was aimed against the abuses growing out of *such legislation,* and its object was to restrain the passage of *such Acts,* and to prevent the release of debts and obligations in particular cases, and in favor of particular individuals unless recommended by the Governor or the Treasury officials. But the clause in the Act of 1880, we are now considering, is not a law of that character. It is not 'An Act for the relief of Charles P. Montague.' It does not appear to have been passed for his especial benefit, and it no more applies to him than it does to all other citizens of the State *in consimili casu. . . ."*

In *M. & C.C. of Balto. v. U. Rwys. & E. Co., supra,* 126 Md. at 52, the Court set forth one of the purposes underlying § 33 as follows:

> "One of the most important reasons for the provision in the Constitution against special legislation

is to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others. . . ."

Later, in *Jones v. House of Reformation, supra,* 176 Md. at 56, the Court stated that

"the constitutional provision was wisely designed to prevent the dispensation or grant of special privileges to special interests, through the instrumentality of special legislation, in conflict with previously enacted general legislation covering the same subject matter . . . ."

*See also Norris v. Baltimore, supra,* 172 Md. at 682-683.

In addition, the Court has pointed to various considerations and factors, although certainly no one is conclusive in all cases. Thus, the Court has looked to the underlying purpose of the legislation in question to determine whether it was actually intended to benefit or burden a particular member or members of a class instead of an entire class, *Beauchamp v. Somerset County,* 256 Md. 541, 549, 261 A.2d 461 (1978) ("the effect intended by the sponsors of the Act was to exempt" one particular entity from certain governmental charges); *Littleton v. Hagerstown, supra,* 150 Md. at 176 ("it seems obvious that the single purpose . . . was to exempt Hagerstown from the operation of the Public Service Commission Law."). Whether particular individuals or entities are identified in the statute has been a consideration, *Reyes v. Prince George's County, supra,* 281 Md. at 305; *Prince George's Co. v. B. & O. R. Co., supra; Baltimore City v. Starr Church, supra.* However, statutory provisions which did not name particular individuals or entities have been held to be prohibited special laws (*e.g., Beauchamp v. Somerset County, supra; Littleton v. Hagerstown, supra,* 150 Md. at 176-177), whereas enactments naming specific entities have been held not to be special laws (*e.g., M. & C.C. of Balto. v. U. Rwys. & E. Co., supra*). The substance and "practical effect" of an enactment is to be considered, and not merely its form, *Beauchamp v.*

*Somerset County, supra,* 256 Md. at 549; *Littleton v. Hagerstown, supra,* 150 Md. at 177; *M. & C.C. of Balto. v. U. Rwys. & E. Co., supra,* 126 Md. at 52. If a particular individual or business sought and received special advantages from the Legislature, or if other similar individuals or businesses were discriminated against by the legislation, this would support a conclusion that the Act constitutes a prohibited special law, *Littleton v. Hagerstown, supra,* 150 Md. at 183; *M. & C.C. of Balto. v. U. Rwys. & E. Co., supra,* 126 Md. at 51, 52. The public need and public interest underlying the enactment, and the inadequacy of the general law to serve the public need or public interest, are pertinent considerations, *Jones v. House of Reformation, supra,* 176 Md. at 55-58; *Norris v. Baltimore, supra,* 172 Md. at 683. *See also Williams v. Baltimore,* 289 U.S. 36, 53 S. Ct. 431, 77 L. Ed. 1015 (1933). Finally, in deciding whether an enactment applies to an entire class, or applies only to certain members of the class and therefore is prohibited by § 33, the Court has reviewed the legislatively drawn distinctions to determine whether they are arbitrary and without any reasonable basis, *Littleton v. Hagerstown, supra,* 150 Md. at 176, 179-180.

In light of the principles set forth in the above-cited cases, the conclusion is inescapable that the mass merchandiser exemption to the Divestiture Law, with its limited qualifying dates, is a prohibited special law under Art. III, § 33. The record in this case shows that the exemption was sought by Montgomery Ward, that the Legislature was advised that one business was the sole beneficiary,[7] that Montgomery Ward is the only subsidiary of a producer or refiner which can qualify, and that no other existing general

---

7. The Department of Fiscal Service, the financial service arm of the General Assembly (Code (1957, 1978 Repl. Vol., 1980 Cum. Supp.), Art. 40, §§ 57-59, 61), advised the members of the Legislature, in a "Fiscal Note" prior to the enactment of the exemption, as follows:

"The Comptroller's Gasoline Tax Division advises that this bill directly affects only one chain department store, owned by a petroleum company, that also has gasoline outlets at some of its locations."

retail mass merchandiser could qualify in the future if it became a subsidiary of a producer or refiner.

The defendant state officials and Montgomery Ward, in arguing that the mass merchandiser exemption does not constitute a forbidden special law, rely upon this Court's recent decision in *Reyes v. Prince George's County, supra.* Montgomery Ward claims that the facts of the instant case "are nearly identical to those in *Reyes . . .*" (brief, p. 37). In *Reyes,* the challenged statute authorized Prince George's County to sell revenue bonds to finance the construction of "any sports stadium or sports arena in Prince George's County." The Act was challenged as a special law on the ground that, at the time of its enactment, there was in fact only one beneficiary in the county, the Washington National Arena. Judge Digges for the Court pointed out that if the Washington National Arena were the only beneficiary, by the Act identifying the arena by name *"or in any equivalent manner,"* it might well have been a special law, 281 Md. at 305 (emphasis supplied). However, we upheld the statute because it applied to sports arenas or sports stadia in the county generally, and that any additional sports arenas or stadia were eligible for county financing.

The present case would be like *Reyes* except for the January 1, 1979, qualifying dates. With those dates deleted, Montgomery Ward would still be the only present beneficiary of the mass merchandiser exemption. Nevertheless, if another retail mass merchandiser selling gasoline became a subsidiary of a producer or refiner after it began the sale of gasoline, it also would qualify under the statute. However, the effect of the January 1, 1979, qualifying dates is virtually the same as if the statute had named Montgomery Ward. The qualifying dates are, in the language of the *Reyes* case, the "equivalent manner" of identifying Montgomery Ward. To come within the exemption, a mass merchandiser must have been operating a service station as of January 1, 1979, and must have been a subsidiary of a petroleum producer or refiner as of January 1, 1979. Most retail mass merchandisers are ineligible under both qualifying dates. A very few (*e.g.,* Sears Roebuck and Company) could meet the

first qualifying date, as they were operating service stations as of January 1, 1979, but they could not meet the second qualifying date, as they were not subsidiaries of producers or refiners as of January 1, 1979. It is undisputed that no existing retail mass merchandiser in Maryland — no competitor of Montgomery Ward — could in the future come within the exemption because of the January 1, 1979 "grandfather clauses." This distinguishes the instant case from *Reyes* and similar cases relied on by the defendants and by Montgomery Ward.

The defendants and Montgomery Ward also point to the expert testimony below, that exempting "mass merchandiser gasoline retailers was beneficial to and consistent with the public purpose of the original Divestiture Law — to preserve competition and fairness in retail marketing," that gasoline selling by "mass merchandisers does not present the unfair competition problems which result when producers and refiners (who are primarily concerned with gasoline volumes) directly operate retail gasoline facilities," and that the "gasoline consumer is benefited from the availability of the alternate sources of supply presented by mass merchandisers . . . retail gasoline facilities." (Brief of the Governor, Attorney General and Comptroller, p. 32). We agree that these considerations, well-supported by the evidence and findings of the trial court, would justify an exemption from the divestiture requirements for mass merchandisers. Such an exemption would represent a legitimate class, and it would not be prohibited by Art. III, § 33, or by equal protection principles. However, this is not the exemption enacted by the Legislature. The considerations pointed to by the defendants do not justify an exemption for only one mass merchandiser and for no others. There has been no testimony, speculative reasons, or anything else advanced in this case which would furnish any justification for the January 1, 1979, grandfather clauses. If, as the defendants argue, the members of the beneficiary class are retail mass merchandisers, it is clear that the exemption only applies to part of the class and is, consequently, a prohibited special law under the definition set forth in cases such as

*Littleton v. Hagerstown, supra,* 150 Md. at 176; *Grossfield v. Baughman, supra,* 148 Md. at 339; and *Prince George's Co. v. B. & O. R. Co., supra,* 113 Md. at 183.

Additionally, the state officials and Montgomery Ward suggest that there might be a future beneficiary of the exemption. It is argued that if there were, as of January 1, 1979, a subsidiary of a producer or refiner which was, as of January 1, 1979, operating retail service stations in Maryland, and which would continue to operate them, it is possible that the subsidiary could in the future expand its non-petroleum sales to such an extent that at sometime in the future less than two percent of its gross receipts would derive from petroleum products. The only entity which is identified as falling in this category is Tesoro Gasoline Marketing Company, a subsidiary of Tesoro Petroleum Corporation, and the operator of one retail service station in Maryland. The record shows that Tesoro Marketing now has *no* gross revenues from retail operations unrelated to the sale of petroleum products. Apart from being entirely unrealistic, there is a problem under the statute with this argument. Under the terms of the statute, long before Tesoro Marketing's non-petroleum retail sales in Maryland could go from nothing to over 98 percent, Tesoro Petroleum Corporation would have to divest itself of the company-operated station in Maryland and turn it into a dealer operation. In light of this, the possibility suggested by the state officials and Montgomery Ward is virtually inconceivable.

Lastly, it is argued that even if the mass merchandiser exemption is a special law, the subject matter of the 1979 exemption was not provided for in the general law, and that, therefore, the special law is permitted under Art. III, § 33. There is no merit to this contention. The Divestiture Law, enacted in 1974 and 1975, was specifically designed to preclude producers or refiners from operating retail service stations in Maryland, either directly or indirectly through a subsidiary or agent. As a subsidiary of a major oil company, Montgomery Ward fell squarely within the ambit of the preexisting general law. Additionally, by expressly

enumerating those types of operations to which the Act would apply, the Divestiture Law necessarily provided for its own exemptions. As we pointed out in *Governor v. Exxon Corp., supra,* 279 Md. at 438, the provisions of the Act

"prohibit only producers and refiners of petroleum products from operating retail service stations while permitting 'wholesalers, *mass merchandisers,* food retailers, and gasoline marketers' to operate retail service stations...." (Emphasis added.)

This classification in the original act, exempting wholesalers, independent mass merchandisers, etc., was upheld in the *Exxon* case on equal protection grounds. Consequently, the general law did make provision for the same subject matter as the 1979 mass merchandiser amendment.

As we agree with the trial court that the 1979 mass merchandiser exemption is invalid under Art. III, § 33, of the Maryland Constitution, it is unecessary for us, and it was unnecessary for the trial court, to reach the equal protection issues. In this connection, however, we observe that the resolution of the questions is certainly not free of doubt. *See, e.g., O.C. Taxpayers v. Ocean City,* 280 Md. 585, 595, 375 A.2d 541 (1977) (pointing out that "a grandfather clause is justified [on equal protection grounds] by some rationale other than merely conferring a benefit on some to the exclusion of others."). Nevertheless, as it is unnecessary to decide the matter, upon remand the declaratory judgment should be modified to express no conclusion on the equal protection issues.

(3)

The trial court, although severing the unconstitutional 1979 mass merchandiser statute from the remainder of the Divestiture Law, invalidated the 1979 Act in its entirety. It appears that neither the trial court nor any party below

considered the severance of the valid portions of the 1979 enactment from the invalid portions of that statute.

The relevant principles with respect to severability were summarized in *O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 600-601:

"In determining whether or not the valid portions of a statute or statutory scheme are severable from the invalid portions, the courts look to the intent of the legislature. The intent to be ascertained in questions of severability, however, is not the 'actual' legislative intent; the actual legislative intent is manifestly to pass the act as written in its entirety. Rather, when severability is the issue, the courts must look to what *would have been the intent* of the legislative body, if it had known that the statute could be only partially effective. *Anne Arundel County v. Moushabek,* 269 Md. 419, 428, 306 A.2d 517 (1973); *Sanza v. Maryland Board of Censors,* 245 Md. 319, 338, 226 A.2d 317 (1966), and cases there cited. That is, would a legislative body, at the time of enactment, have intended that the valid portions be separately effective if it had known that the invalid portions were incapable of being carried out. In the determination of this legislative intent, in addition to considering the legislative history of an enactment, courts have applied a number of principles. These principles, like all rules of statutory construction, are not inflexible commands, but merely aids in determining legislative intent.

"Perhaps the most important of these principles is the presumption, even in the absence of an express clause or declaration, that a legislative body generally intends its enactments to be severed if possible. Thus it is a settled policy that, upon finding that a statute is invalid in some respect, it 'becomes the duty of the court whenever possible to separate the valid from the invalid provisions,'

*Davidson v. Miller,* 276 Md. 54, 83, 344 A.2d 422 (1975). *Accord, Shell Oil Co. v. Supervisor,* 276 Md. 36, 48, 343 A.2d 521 (1975); *Bringe v. Collins,* 274 Md. 338, 351, 335 A.2d 670 (1975); *Clark's Park v. Hranicka,* 246 Md. 178, 185, 227 A.2d 726 (1967); *Baltimore City v. Stuyvesant Co.,* 226 Md. 379, 390, 174 A.2d 153 (1961).

"Moreover, the presence of a severability clause in an enactment, while not conclusive, reinforces the presumption that a legislative body would have intended to enact the valid provisions of a statute, notwithstanding the invalidity of certain portions. *Anne Arundel County v. Moushabek, supra,* 269 Md. at 428; *Sanza v. Maryland Board of Censors, supra,* 245 Md. at 338; *Police Comm'r v. Seigal, Etc., Inc.,* 223 Md. 110, 134, 162 A.2d 727, *cert. denied,* 364 U.S. 909, 81 S. Ct. 273, 5 L. Ed. 2d 225 (1960).

"When the dominant purpose of an enactment may largely be carried out notwithstanding the statute's partial invalidity, courts will generally hold the valid portions severable and enforce them. *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 49; *Anne Arundel County v. Moushabek, supra,* 269 Md. at 430. On the other hand, when a statute contains both a general provision and an invalid exception, courts have often refused to sever when the severed statute would impose a duty, sanction or substantial hardship on the otherwise excepted class. *State v. Schuller,* 280 Md. 305, 372 A.2d 1076 (1977); *Curtis v. Mactier,* 115 Md. 386, 80 A. 1066 (1911); *Nutwell v. Anne Arundel County,* 110 Md. 667, 73 A. 710 (1909); *Storck v. Baltimore City,* 101 Md. 476, 61 A. 330 (1905). However, when the legislature has otherwise indicated what its intent would have been if such an exception were held invalid, the courts have severed. *Utah Power and Light Co. v. Pfost,* 286 U.S. 165, 52 S. Ct. 548, 76 L. Ed. 1038 (1932); *Greene v. State,* 11 Md. App. 106, 273 A.2d 830 (1971)."

Turning to the present case, the invalidity of Ch. 659 of the Acts of 1979 is due entirely to the January 1, 1979, qualifying dates. Severance of these qualifying dates from the remainder of the 1979 legislation will comply with the purpose of that enactment in exempting mass merchandisers from the operation of the Divestiture Law. It will also be consistent with a purpose of the original Divestiture Law which, as indicated in the *Exxon* case and the testimony below, was not to preclude the operation of gasoline service stations by retail mass merchandisers. Moreover, the Legislature in 1979 clearly intended to confer a benefit upon the only mass merchandiser which, at that time, was owned by a producer or refiner of petroleum products. As indicated in the *Ocean City* case, 280 Md. at 601, severability principles ordinarily are not applied so as to impose a duty, sanction or substantial hardship on members of a class which the Legislature intended to exempt. On the other hand, invalidating the entire 1979 statute, but severing it from the remainder of the Divestiture Law, will impose a hardship upon an entity which was intended to be exempt. Finally, the presumption in favor of severability reinforces the conclusion that only the January 1, 1979, limitation clauses should be invalidated.

As severed, if another mass merchandiser begins selling gasoline and later becomes a subsidiary of a producer or refiner, it will be permitted to operate those retail service stations existing as of the date it becomes a subsidiary. However, as the mass merchansider exemption does not apply to the prohibition against producers or refiners opening new stations, the acquiring producer or refiner will not, under the statute, be able to open new stations after the date of acquisition. Thus, other mass merchandisers will be in the same category and competitive position as Montgomery Ward.

(4)

In light of the above determinations, the appeals of Southern States Cooperative, Montgomery Ward and Gladstone

from the orders denying intervention have largely been rendered academic. Both Southern States and Montgomery Ward raised the intervention issue as an alternative ground for relief, and our disposition of the case makes it unnecessary to decide the matter. With respect to Gladstone, we find no error in the trial judge's ruling.

Upon remand, the declaratory judgment should be modified to reflect the determinations in this opinion. The order enjoining the enforcement of the Divestiture Law against Cities Service will expire, by its own terms, on the issuance of our mandate.

> *Judgment of the Circuit Court of Baltimore City vacated, and case remanded to that Court for further proceedings consistent with this opinion.*
> *Each party to pay its own costs.*